STATE of Minnesota, Respondent,

v.

Stuart Willis KNOWLTON, Appellant.

No. C6–83–1121.

Supreme Court of Minnesota.

March 21, 1986.

C. Paul Jones, State Public Defender, Lawrence Hammerling, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Foley, Ramsey Co. Atty., St. Paul, for respondent.

AMDAHL, Chief Justice.

This case comes before us on defendant's appeal from his conviction in Ramsey County District Court for murder in the first degree. Specifically, defendant claims: (1) the evidence was insufficient on which to base a conviction; (2) his right to due process of law was violated by the admission of certain testimony; (3) the trial court committed reversible error in denying his pretrial motion for a change of venue; and (4) two of his three convictions for murder in the first degree should be vacated. We affirm defendant's conviction as modified.

At approximately 6:40 p.m. on November 10, 1981, Cassandra Hansen, age 6, accompanied by her mother and sister, arrived at a church in St. Paul's Midway area for a "family night" program which was to begin at 7 p.m. Sometime between 6:50 and 7 p.m., Cassandra received her mother's permission to use the bathroom. Although there was a bathroom on the lower level of the church where the auditorium was located, the evidence revealed that Cassandra most probably intended to use another bathroom on the upper level. Three witnesses saw her in the lower hallway and on the stairway leading upstairs. Two of those witnesses also identified defendant as a man they had seen walking in the hall and heading up the stairs shortly after they saw Cassandra. Shortly after 7 p.m., Cassandra's mother realized Cassandra had not returned to the auditorium. A subsequent search of the premises by church staff members revealed no sign of the child and the police were called.

Shortly before 11 a.m. on the following day, November 11, Cassandra's body was

found in a dumpster behind the Auto Clinic located on the corner of Grand and Grotto in St. Paul's Crocus Hill area. The cause of death was determined to be ligature strangulation having occurred between 8 p.m. and midnight on November 10. The victim had been beaten about the face, head, ribs, and shoulder, and marks found on her face were consistent with someone's hand tightly placed over her mouth. A sexual assault examination revealed no signs of sexual penetration, but police investigators discovered the presence of semen on the victim's clothing.

Defendant was working on the evening of November 10 at his normal job as a taxicab driver. His cab contained a two-way radio over which he communicated with his dispatcher on a regular basis. The dispatchers on duty that evening were not able to make contact with nor did they receive any communications from defendant that evening between 5 or 6 p.m. and approximately 3 a.m. the following morning. Both dispatchers testified this was unusual, especially for defendant.

At approximately 7:50 p.m. on November 10, defendant was seen in an Arthur Treacher's Restaurant at Grand and Grotto. A witness observed defendant for nearly 30 minutes in the restaurant and testified that defendant had made him nervous. As the witness left the restaurant, he saw defendant standing outside staring in the direction of the Auto Clinic.

Defendant was later seen sitting in a parked car on Milton between Goodrich and Fairmount by another witness. The same witness was bicycling down Milton the following morning and noticed a girl's black patent leather shoe in the street in the area where he had seen the parked car and defendant the previous evening. This shoe was later identified as a shoe Cassandra Hansen had worn to the church on November 10. Her other shoe was found November 12 in the same vicinity.

Defendant was next seen at 3 a.m. on November 11. He had gone to a massage parlor in St. Paul purportedly to get acquainted with employees and to give them his business card. Dorothy Noga noticed

defendant was hunched over, breathing heavily, shaking, and talking "real fast."

Shortly thereafter, defendant called his dispatcher on the cab radio and reported that a fare had stolen his briefcase which contained his trip sheets. Trip sheets are records that the city requires cabdrivers to maintain. The following morning, defendant telephoned the owner of a cab company for whom he had previously worked and asked if he could buy trip sheets from her. He told her his new employer did not supply them. His new employer, however, disputed this representation and stated that several hundred trip sheets were on hand and available to defendant on the evening in question.

Three occupants of a fourplex located in the 900 block of Grand Avenue in St. Paul testified they saw defendant standing across the street throughout much of the morning of November 11, the morning the victim's body was found. The witnesses noted his gaze was constantly fixed to the east, in the direction of the Auto Clinic a few blocks away. They observed defendant leaning against a retaining wall and he would walk from the wall to the curb, apparently to get a better view up the street. They testified defendant also seemed oblivious to passersby. Later that day, defendant went to work as usual. The dispatcher on duty testified that shortly after defendant took his cab out, defendant called in twice on the cab radio and "ranted and raved" about the Cassandra Hansen murder. Both times the dispatcher had to cut off defendant and explain it was an improper use of the cab radio.

The police investigation quickly focused on defendant. The police called defendant in for questioning on November 12, but he was released because the police had insufficient evidence at that time on which to charge him. Defendant was properly read his *Miranda* rights at that time.

Police and FBI experts examined the physical evidence discovered on the victim's body. The evidence showed several semen stains on the victim's clothing revealing the source as a man with type "O" blood who was a secretor. A secretor is a person

whose blood type can be detected by examination of other body fluids. Eighty percent of the population are secretors; 45% possess "O" type blood. Defendant has type "O" blood and is a secretor.

A pubic hair was found on the victim's clothing which was determined could not have come from the victim, her mother, or her father. The hair matched a sample provided by defendant. Although hair examinations are not conclusive as to identity, this exam was noteworthy because both hairs possessed tiny rings or bands which are rarely found and are believed to be caused by disease.

Defendant's due process complaint arises from the testimony of three witnesses, Dorothy Noga, Janice Lloyd, and Janice Rettman. Dorothy Noga had telephoned the police on November 11 because she suspected an individual, not defendant, to be involved in the crime. The police showed her several photographs and she recognized defendant as the man who had come in early that morning. She then volunteered to contact defendant, but the police recommended that she not do that. Noga insisted on calling him.

On November 17, Noga did call defendant. Defendant was unable to talk at the time and he returned her call the following day. They had a very long conversation during which defendant confessed to killing Cassandra Hansen and described in detail the circumstances surrounding her death. On December 8, 1981, Noga took defendant for a drive in her car. She drove him past the church where Cassandra was last seen and defendant became extremely agitated. On December 13, in another telephone conversation, defendant again confessed to the killing. Although Noga had been taping her conversations, or portions of them, with defendant, neither this confession nor the confession of November 18 was recorded.

Following the December 13 confession over the phone, Noga and defendant began to argue. Defendant became angry and hung up. Shortly thereafter, defendant arrived at Noga's workplace and resumed the argument. Defendant physically attacked Noga, again confessing to the killing, and critically injured her with a knife. Noga lost her memory about the incident and did not regain it until April 1982.

Janice Lloyd was a friend of defendant with whom defendant often talked on the telephone. At 10:30 p.m. on November 13, 1981, defendant telephoned Lloyd and explained he was a suspect in the Hansen murder case. He questioned her as to whether he had phoned her on November 10, the date of the murder, but Lloyd denied having such a telephone conversation with him. She recalled that he had called her every night for 3 weeks before that date, as well as on the 11th and 12th, but not the 10th. When she asked him if the allegations were true, he responded that he wasn't really sure and needed someone to talk with. Lloyd refused to tell others they had spoken on the 10th. Lloyd contacted the police who asked her to record any further conversations with defendant. Defendant made no more damaging admissions to her aside from a reference to his bad temper.

Janice Rettman was another acquaintance of defendant who agreed to record conversations with defendant. In conversations with Rettman, defendant also made reference to his "fairly explosive temper" and that he could not remember where he was the night Cassandra Hansen was killed. After the attack on Dorothy Noga, defendant twice called Rettman "Dorothy" and said he had the feeling that Noga and Hansen were somehow linked together.

Defendant offered testimony of several people who saw girls matching Cassandra Hansen's description on the evening of November 10 at various points in the Midway area. He also offered a purported confession to the murder by a woman who had moved from the Twin Cities to Amarillo, Texas. At the time of trial, the woman, who was being treated in the mental health unit of a local hospital, denied any involvement in the case.

On September 28, 1982, a Ramsey County Grand Jury indicted defendant on three counts of murder in the first degree. On December 10, 1982, defendant moved the

court for a change of venue on the basis of prejudicial pretrial publicity. That motion was denied, but due to a continuance granted on other grounds, the court granted defendant leave to renew the motion at the time of trial. When the trial began in April 1983, however, defendant did not renew the motion and for reasons which are unclear, waived his right to a trial by jury. Following a 3-week trial, the court found defendant guilty of all three counts of the indictment and sentenced defendant to life in prison for violation of count 1, homicide while committing or attempting criminal sexual conduct in the second degree.

■ 1. Defendant first challenges his conviction on the basis of insufficient evidence. Where a defendant waives his right to a jury trial, a trial court's findings will be given the same weight as a jury verdict. *State v. Bouwman,* 354 N.W.2d 1, 4 (Minn. 1984). Thus, this court is limited to ascertaining whether the trial court, " 'giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty' of the offense charged." *State v. Ibarra,* 355 N.W.2d 125, 129 (Minn. 1984) (quoting *State v. Turnipseed,* 297 N.W.2d 308, 313 (Minn.1980)). The evidence must be viewed in the light most favorable to the verdict, *State v. Dodis,* 314 N.W.2d 233, 237 (Minn.1982), but where a conviction is based substantially upon circumstantial evidence, as here, the result will be sustained on appeal only when "the 'reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt.' " *State v. Threinen,* 328 N.W.2d 154, 156 (Minn.1983) (quoting *State v. Kotka,* 277 Minn. 331, 334, 152 N.W.2d 445, 448 (1967), *cert. denied,* 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968)).

■ We believe the evidence in this case compels only one conclusion, that defendant is guilty as charged. Although defendant's conviction is based largely on circumstantial evidence, the cumulative effect of that evidence upon defendant was devastating. We therefore sustain the conviction against defendant's challenge to the sufficiency of the evidence.

■ 2. Defendant also claims his rights to due process of law under the fifth amendment were violated when his friends and acquaintances, having conferred with police, continued to question him about the Hansen killing after his attorney had instructed police not to question defendant in the absence of counsel. Defendant concedes that since he was not in custody at the time of the incriminating conversations, his fifth amendment *Miranda* rights were not violated. *See Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). He also concedes that his sixth amendment right to counsel was not violated because formal judicial proceedings had yet to be commenced. *See United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984).

■ Instead, defendant submits the police conduct was so egregious in this case that it violated his fundamental right to due process of law. As precedent, defendant cites *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), a case involving police officers forcing a defendant's stomach to be pumped at a hospital to recover evidence they observed defendant swallow. The Supreme Court ordered the evidence be suppressed at trial observing, "This is conduct that shocks the conscience." *Id.* at 172, 72 S.Ct. at 209. We hold the trial court properly admitted the witnesses' testimony because the *Rochin* standard was not met.

■ 3. Defendant contends the trial court erred in denying his pretrial motion for a change of venue. He claims the denial impaired his right to a fair trial and virtually forced him to waive his right to a jury trial. As noted above, although defendant was granted leave to renew his motion immediately before trial, he declined to do so. He therefore waived any right he may have had to a change of venue and it cannot be fairly said he was forced to waive a jury.

4. Defendant lastly claims he was improperly convicted on all three counts of first-degree murder listed in the indictment. The record does not expressly reflect the count on which he was convicted; however, the trial court, having found him guilty of all three counts, sentenced him only on count 1, a homicide committed during the commission or attempt to commit criminal sexual conduct in the second degree. It is therefore apparent that the court intended the conviction to rest only on that finding of guilt under count 1 in accordance with the well-established rule that an individual cannot be convicted twice for the same offense against the same victim on the basis of the same act. *See State v. Ture*, 353 N.W.2d 502, 517 (Minn.1984); Minn.Stat. § 609.04 (1984). We therefore direct that any ambiguity existing in the record be clarified in accordance with this opinion.

Affirmed as modified.