STATE of Minnesota, Respondent,

v.

Gary Alan MILLER, Appellant.

No. C6-91-1679.

Supreme Court of Minnesota.

July 24, 1992.

John M. Stuart, State Public Defender, Susan L.-P. Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin Co. Atty., Donna J. Wolfson, Asst. Co. Atty., Minneapolis, for respondent.

TOMLJANOVICH, Justice.

Appellant Gary Alan Miller appeals his three convictions for first degree murder arguing that the trial court abused its discretion in refusing to grant his pre-trial motions for continuances. Appellant also argues that the evidence was insufficient to support the jury verdicts of first degree murder and that the trial court abused its discretion by imposing three consecutive life sentences. We affirm.

Appellant met Debra Huck in the spring of 1988 and after three months, they rented a house and moved in together. Huck's three children also lived with them. In July of 1990, Huck gave birth to appellant's daughter. After the baby was born, Huck became depressed and her relationship with appellant deteriorated. Huck started to go to the local bars without appellant and with Rose McKeever, a friend who lived near by. McKeever lived with her brother, Robert Wrazdilo. Appellant suspected that Huck and Wrazdilo were having an affair so he attached a voice-activated tape recorder to the phone. Appellant recorded a conversation between Huck and Wrazdilo which confirmed his suspicions. On September 22, 1990, appellant confronted Huck at her parents' house with the tape recording. A violent argument ensued where appellant started choking Huck and screamed, "You're dead, bitch! I'll slash your fuckin' throat!" Huck's mother separated appellant and Huck. Appellant moved out of the house shortly thereafter but the locks were never changed and appellant kept a key to the house. After he left, the neighbors noticed that appellant kept watching the house either parking down the street or driving by. Appellant blamed McKeever for introducing Wrazdilo to Huck. Appellant boasted to the grandmother of one of Huck's children, that he wanted to kill McKeever and "take her out slow." Appellant made these feelings toward McKeever known to others as well. Appellant also told the grandmother that he also wanted to "blow away" both Huck and Wrazdilo.

After moving out, appellant abducted his daughter from Huck. On the night of October 4, 1990, appellant entered Huck's house while she and her four children slept. Appellant admitted that he used his key to gain entry and did not awaken anyone during the abduction. Appellant claimed he wanted custody of his daughter. Although he initially denied any involvement, after being arrested appellant admitted that he had taken the child. After the baby was returned, Huck's stepfather installed safety chains on the doors to her house. The locks, however, were not changed. Huck's brother, Tom Huck, stayed with her for about three weeks for protection until McKeever and Wrazdilo moved in with her.

Appellant testified that he acted as a "safe house" for drugs. Appellant testified that he would receive packages in the mail and other couriers would pick up the packages from him and smuggle them into Stillwater prison. Appellant testified that on one occasion in the fall of 1990, McKeever intercepted and stole one of the packages of drugs intended for him. Appellant testified that both he and McKeever received threats from the individuals awaiting delivery of these drugs. Appellant told co-workers of his plan to plant drugs in Debra Huck's house to make her look like an unfit mother so that he could gain custody of his daughter. Appellant also told the manager of the convenience store where he worked how easy it was to enter the house and that he wanted to go in and "beat them up."

Appellant testified that he was afraid of others involved in the drug conspiracy and needed a gun for protection. Since appellant was a convicted felon who could not legally purchase a firearm, appellant enlisted the help of his younger brother, Troy Miller. Troy, accompanied by appellant, bought a Llama .380 semi-automatic pistol at a sporting goods store in Mankato on October 27, 1990. Appellant also picked out some holsters and ammunition. Appellant later claimed that he sold the Llama to Morrie Uran. At trial, Morrie Uran denied ever meeting appellant or purchasing the Llama from him. Appellant also had Troy

purchase a Browning pistol which he had Troy trade for an Intertec 9 mm semi-automatic pistol.

In the early morning hours of December 11, 1990, a perpetrator entered Debra Huck's house. The lock on the door was not forced which meant that the perpetrator either used a key or the door was unlocked. The safety chain on the door had been cut to gain entry. The perpetrator went to the bedroom where Huck and Wrazdilo slept and shot Wrazdilo once in the head killing him. The perpetrator then turned to Huck and put three bullets in her head killing her also. Huck apparently was awakened by the first shots and attempted to shield herself since one of the bullets passed through her hand and hit her in the mouth. Finally, McKeever was shot twice in the head. Her body was found on the couch in the living room. Since her bed was in the basement, McKeever apparently awakened, came upstairs and was shot. A police firearms expert testified that the victims were all shot with a .380 caliber semi-automatic pistol. The shots could have been fired from a Llama .380 but the murder weapon was never recovered. These shootings occurred while four children slept in the house, one of whom was appellant's. Appellant denies any involvement in the killings and claims he was home alone watching a movie. The children found the victims the next morning and sought help. When the authorities arrived, McKeever was still alive. She was rushed to the hospital for emergency surgery where she died the following day.

In the house, the police found ten baggies of cocaine scattered about the bedroom and kitchen. Three baggies of marijuana were also found strewn about the kitchen. The drugs had an estimated street value of $1,000. The police also found a plastic scale in the kitchen and surgical gloves by it. Surprisingly, no fingerprints were on any of the drugs or drug paraphernalia as would typically be expected. To the police, it appeared as though someone planted the drugs to make the shootings look drug-related. One of the officers testified that if there had really been a "drug rip-off", the perpetrator would not have left the drugs behind.

Appellant testified that when he awoke on December 11, 1990, he found a bolt cutter and holster on his porch. Appellant testified that he thought that he was being set up so he packed these items along with some other incriminating evidence in a leather satchel and sent it to his brother, Troy. Appellant called Troy and told him a bag was on its way. Appellant stated, "I'm kind of in some shit. Pick up the bag and hold on to it." Troy received the bag that day. In the bag was the Intertec 9 mm semi-automatic pistol; a pair of cheap handcuffs; a long-handled bolt cutter; two holsters for the Llama .380; and a plastic bag with letters addressed to Rodney Miller. In the first letter, appellant wrote:

Rod, if you're reading this letter, it means that I'm in jail and things didn't go as planned. I'm most likely getting some heavy time. It's up to you now. I'll give you as much help as I can. Do your best and, remember, I will not rot in prison for life so, that only leaves one thing left to do. Take care and remember kinship is strong. Your brother.

The second letter could be interpreted to mean that appellant wanted Rodney to kill Tom Huck who lived at McKeever and Wrazdilo's old apartment. The letter, which included a map of Tom Huck's apartment, concluded with the exclamation, "Free me!!!"

Police records revealed that Debra Huck had reported three incidents involving appellant. Appellant immediately became a suspect and police sought him for questioning. The police found appellant's vehicle parked at a diner about a mile from the murder scene. The police staked out the vehicle and waited for appellant to leave the diner. The police arrested appellant as he drove away from the diner. A search of appellant's vehicle revealed a needle nose pliers and a "side cutters" in the inside of the engine cover. There was a brass or yellow colored substance on one of these tools. The safety chain that was cut also had a similar colored surface. After analyzing the yellow substance on the tool, the

tests were inconclusive as to whether it was the one actually used to gain entry into Huck's house.

Appellant was indicted on three counts of first degree murder on January 3, 1991. On January 14, 1991, appellant was arraigned on the charges and entered a plea of not guilty. On February 25, 1991, the trial court set an initial trial date of April 1, 1991. The trial court subsequently granted the defense a continuance and set the Rasmussen hearing for May 9, 1991, and the trial to begin on May 13, 1991. On April 25, 1991, the trial court denied defense counsel's motion to withdraw due to appellant's refusal to cooperate with him. The court granted both defense and state motions to have a Rule 20.01 examination performed to assess appellant's competence to stand trial since appellant had attempted to escape and claimed he had not eaten since April 1. Appellant refused to talk with the examining psychiatrist who characterized appellant's decision not to cooperate as a "deliberate willful act." On May 9, 1991, the trial court found appellant competent to stand trial; denied defense counsel's renewed motion to withdraw; and denied appellant's motion for a continuance. The trial court refused to condone appellant's lack of cooperation with the examining psychiatrist or his attorney noting that such decisions were voluntary.

Following a jury trial, appellant was convicted of three counts of first degree murder for the killing of three individuals in violation of Minn.Stat. § 609.185(1) (1990). He was sentenced to three consecutive life terms in prison. This direct appeal followed.

## I.

█ Appellant argues that his rights to due process of law were violated when the trial court denied his pre-trial motions for continuances. The decision to grant a continuance is vested in the sound discretion of the trial court. *State v. Lloyd*, 345 N.W.2d 240, 247 (Minn.1984). The trial court will not be reversed unless it has abused its discretion. *State v. Turnipseed*, 297 N.W.2d 308, 311 (Minn.1980). A reviewing court looks at the circumstances surrounding the requested continuance and whether the denial was so prejudicial in the preparation of an adequate defense as to "materially affect the outcome of the trial." *Lloyd*, 345 N.W.2d at 247.

█ As an initial matter, it is important to note that the trial court did grant one of the defense motions for a continuance moving the trial from April 1, 1991 to May 13, 1991. Appellant asserts basically two reasons why another continuance was warranted. First, appellant argues that he was mentally incompetent during the time leading up to trial. Second, appellant argues that since the investigation was continuing, that a continuance was needed to see if exculpatory evidence would be revealed.

Appellant argues that he was mentally incompetent before trial based on the following: appellant attempted an ill-advised escape; appellant refused to eat for a period of time; appellant kept a diary of those who came to see him; and appellant refused to cooperate with his attorney for about six weeks. This allegation of mental incompetence is totally unsupported by evidence. After appellant attempted his escape and refused to eat, the trial court granted the joint motion by the state and defense counsel for a Rule 20.01 examination to determine if appellant was competent to stand trial. When the psychiatrist attempted to examine appellant, appellant refused to talk to him telling the doctor twice "leave me alone." The psychiatrist noted in his report "that there is no evidence to support a mental illness" and the appellant's refusal to cooperate "is a deliberate willful act and not the product of any mental illness." All indications are that appellant voluntarily decided to act as he did.

█ Appellant next argues that since the investigation was still open, a continuance was warranted. The trial court noted that if there was any problem with discovery, it existed because of appellant's voluntary decision not to cooperate. Criminal defendants could stall their trials indefinitely if they were able to gain continuances merely

by refusing to cooperate with their attorneys or with those sent to examine them. Here, appellant had ample time to prepare a defense. His public defender was appointed on December 13, 1990, and trial did not commence until May 13, 1991. Based on the evidence implicating appellant and the trial court's grant of one continuance, the trial court's refusal to grant a second continuance did not materially prejudice the outcome of the trial.

## II.

■ Appellant next argues that there was insufficient evidence to support the jury verdicts of first degree murder.

'The standard of review of a jury conviction in an insufficiency-of-evidence appeal is whether, viewing the evidence and any reasonable inferences that could be drawn therefrom in a light most favorable to the state, the jury could reasonably find the defendant guilty beyond a reasonable doubt. In conducting this review, the court assumes the jury believed the state's witnesses and disbelieved evidence to the contrary. The jury determines the credibility and weight to be given the testimony of witnesses.'

State v. DeWald, 463 N.W.2d 741, 748 (Minn.1990) (quoting State v. Boitnott, 443 N.W.2d 527, 531 (Minn.1989)). A jury conviction based on circumstantial evidence warrants a higher standard of review. Id. "The stricter standard of appellate review of a conviction based on circumstantial evidence still recognizes a jury is in the best position to evaluate the circumstantial evidence surrounding the crime, and its verdict is entitled to due deference." State v. Race, 383 N.W.2d 656, 662 (Minn.1986) (citations omitted). " 'The evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt.' " Dewald, 463 N.W.2d at 748 (quoting State v. Bias, 419 N.W.2d 480, 484 (Minn.1988)).

■ The state produced compelling and substantial circumstantial evidence implicating appellant in the murders. On several occasions, appellant expressed to several people his intent to kill the three victims. Appellant had a relationship with Debra Huck that ended badly. He was angry at McKeever for introducing Wrazdilo to Huck and angry at Wrazdilo for taking his place. Appellant was obsessed with Huck, watching the house constantly after he moved out.

Appellant had a key to the house and boasted how easy it was to get into the house. In fact on one occasion prior to the killings, appellant used the key to enter the house and silently abduct his daughter. Since there were no signs of forcible entry on the door, the perpetrator who carried out the murders either had a key or the door was unlocked. The perpetrator scattered drugs and drug paraphernalia around the bedroom and kitchen to give the appearance that the shootings were drug-related. This is consistent with appellant's plan, which he told co-workers, to plant drugs at Huck's house to make her look like an unfit mother. The perpetrator used a .380 semi-automatic pistol to carry out the murders. Appellant had obtained a Llama .380 semi-automatic pistol which was never recovered.

Additionally, some of the most incriminating evidence was found in the leather satchel that appellant sent to his brother on the day of the murders. In the bag were bolt cutters which could have been used to cut the safety chain to gain entry into the house. There were also two holsters for the Llama .380 pistol and letters to Rodney Miller indicating that "things didn't go as planned." Appellant also wrote, "I'm most likely getting some heavy time. * * * I will not rot in prison for life * * *." In sum, there is sufficient evidence as a matter of law to support the jury convictions of first degree murder.

## III.

■ Appellant challenges the trial court's imposition of three consecutive life sentences for the triple murder of Huck, McKeever and Wrazdilo. "Whether to impose concurrent or consecutive multiple life sentences for first degree murder falls

within the discretion of the trial court." *State v. Brom,* 463 N.W.2d 758, 765 (Minn. 1990) (citations omitted). Consecutive life sentences for first degree murder are permissible so long as they "are commensurate with culpability and not an exaggeration of defendant's criminality." *Bangert v. State,* 282 N.W.2d 540, 547 (Minn.1979).

In determining whether consecutive sentencing exaggerates defendant's criminality, this court is guided by past sentences received by other offenders. *See State v. Norris,* 428 N.W.2d 61, 70 (Minn.1988). This case parallels the fact situation presented in *State v. Olson,* 291 N.W.2d 203 (Minn.1980). In *Olson,* this court allowed the imposition of three consecutive life sentences where the defendant "with premeditation methodically burned three people to death." *Id.* at 208; *see also Bangert v. State, supra* (two consecutive life sentences appropriate where defendant shot and killed two victims while they slept); *State v. Brom, supra* (three consecutive and one concurrent life sentences appropriate where defendant brutally killed four family members with ax).

■ Here, appellant meticulously planned the killings. He quietly entered the house while all the victims slept. He then shot each of the victims in the head at close range, firing three shots into the head of his former girlfriend. After the killings, appellant spread drugs and drug paraphernalia around the house to give the appearance that the killings were drug-related. All this took place while four children were asleep in the house, one of whom was appellant's. When taking all these factors into consideration, three consecutive life sentences do not exaggerate the criminality of appellant's actions.

Affirmed.