STATE of Minnesota, Respondent,

v.

Todd Michael WARREN, Appellant.

Nos. C0–95–889, C2–95–943, C1–98–463.

Supreme Court of Minnesota.

March 18, 1999.

Rehearing Denied May 18, 1999.

Cathryn Middlebrook, Assistant State Public Defender, University of Minnesota Supreme Court, Minneapolis, for appellant Todd M. Warren.

John B. Galus, Assistant Attorney General, St. Paul, Alan L. Mitchell, Duluth, for respondent State of Minnesota.

## OPINION

PAGE, J.

On January 18, 1995, a St. Louis County jury convicted Todd Michael Warren of three separate counts of murder in the first degree in violation of Minn.Stat. § 609.185(1) (1998)

for the March 28, 1994, shooting deaths of Samuel Witherspoon, Keith Hermanson, and Peter Moore. Warren was sentenced to three concurrent life sentences. Warren appealed his convictions to this court and the state appealed the trial court's imposition of concurrent sentences to the court of appeals, which dismissed the state's appeal for lack of jurisdiction.[1] Warren thereafter filed a motion with this court to stay his direct appeal and remand to the district court for postconviction proceedings, which was granted. Warren's petition for postconviction relief alleged: (1) that he was denied a fair trial by the denial of his motion for a change of venue; (2) that he was denied the right to present a defense by the trial court's evidentiary rulings that limited the amount of evidence about the details of alleged sexual assaults that took place on the night of the murders; and (3) that he should be granted a new trial to present the "newly available" testimony of his accomplice, Doug Towle. The postconviction court denied Warren's petition in all respects. We granted the state's petition for further review on the sentencing issue and consolidated it with Warren's postconviction and direct appeals.

These consolidated appeals present six issues for our review. The issues raised by Warren are whether: (1) he was denied a fair trial by the trial court's refusal to grant a change of venue; (2) he was denied the right to present evidence supporting his heat-of-passion defense; (3) he is entitled to a new trial because of "newly available" testimony from his accomplice; (4) there was sufficient evidence to establish beyond a reasonable doubt that he did not act in the heat of passion; and (5) he was denied the right to a fair trial because of prosecutorial misconduct during closing argument. The state asks this court to decide whether the state has the right to appeal the sentence in a first-degree murder case.

Evidence from Warren's trial established that on March 27, 1994, Warren and his

---

1. See Minn.Stat. § 480A.06, subd. 1 (1998) (stating that the court of appeals "shall not have jurisdiction in * * * criminal appeals in cases in which the defendant has been convicted of murder in the first degree").

girlfriend Deanna[2] Towle went out drinking with a group of friends. Warren was driving Deanna Towle's parents' van. After picking up and dropping off various people throughout the evening and briefly stopping at two other parties, Warren, along with Deanna Towle, her brother Doug Towle, Erin Brademan, Zachary Swanstrom, Gary Running, and Jeremy Johnson (J. Johnson), drove to Dan Johnson's (D.Johnson) house in Duluth. When the group arrived, only D. Johnson and one other person were there, it was after midnight, and both Deanna Towle and Brademan were visibly drunk.

A short time later, another group of young people, including Reid Kern, Jes Durfee, Moore, Witherspoon, Hermanson, and Hermanson's girlfriend, Denise Reid, showed up at the house. Warren only knew the people in this group from seeing them at other parties, including one earlier that evening.

Witherspoon was celebrating his birthday, and both he and Moore encouraged Deanna Towle to continue drinking. After doing so, Deanna Towle began to feel like she was going to throw up and went into the dining room and sat down on a couch. At some point, Brademan began feeling tired and laid down in the dining room. A couple of the men at the party started to harass Brademan and comment on how drunk she was. She was then dragged by her feet from the dining room to the living room, which caused the sweatshirt she was wearing to ride up. Eventually someone removed Brademan's sweatshirt, at which point sexual comments were made. Running reportedly told Kern to roll Brademan over and undo her bra so they could see her breasts, and that if Kern blew in Brademan's ear, her pants would come down. Although Brademan's bra was not removed, one of her breasts did become exposed and was allegedly fondled by Kern.

These events took place in full view of Brademan's friends, including Warren. Deanna Towle told people to leave Brademan alone, but then passed out and did not regain consciousness until three that afternoon. Swanstrom did not think that what was happening to Brademan was a big deal, and J.

Johnson testified that Brademan was giggling and did not appear to be aware of what was happening. Warren testified that he did not do anything about what was happening to Brademan because he assumed that, if Brademan felt threatened, she would have said something. Brademan testified that while she was bothered by what was going on, she did not believe that she was in any kind of danger.

After Brademan was covered with a blanket, D. Johnson told her that she could go to an upstairs bedroom and lie down, which she did, locking the door behind her. Using J. Johnson's credit card, Witherspoon unlocked the door and let himself into the bedroom. Once inside, Witherspoon allegedly forced Brademan to engage in sexual intercourse.

Some time later, Warren went upstairs to look for Deanna Towle and found Witherspoon and Brademan in the bedroom engaging in sexual intercourse. When Warren entered the room, Brademan said, "Todd, why don't you save me? Why can't anybody help me?" Warren asked Witherspoon to come downstairs and drink with him, and Witherspoon responded by telling Warren that he should go away, at which point, according to Brademan, Warren left the room. Warren went downstairs and, without seeming to be particularly concerned, asked Swanstrom if he knew where Deanna Towle was. After Swanstrom told him that he did not know, Warren went to the basement to look for her. He did not say anything to Swanstrom about seeing Brademan and Witherspoon engaging in sexual intercourse.

In the basement, Warren discovered Deanna Towle passed out on a bench with Running and Kern near her. Moore, Durfee, Hermanson, and J. Johnson were also in the basement. Deanna Towle's sweatshirt and bra were up around her neck and her jeans were unbuttoned and partially pulled down. Warren became very angry and demanded to know who had done this to her. Moore asked Warren, "And if you find out who did this to her, what the hell are you going to do about it anyway, you little shit?" Warren

2. There is a conflict in the record regarding the spelling of Deanna Towle's first name. We have chosen to follow the spelling used in Doug Towle's affidavit.

testified that Moore also said, "maybe I screwed her," "what's it matter to you," and "she is entertainment for the night." Durfee testified that Moore "seemed like he wanted to fight." Others also taunted Warren, who, as he became angrier, began hitting the walls with his fists.

Warren left the basement carrying Deanna Towle, and as they left, Moore said to Kern, "way to go." Once upstairs, Warren straightened Deanna Towles' clothes and Swanstrom suggested that they leave. Warren then sent J. Johnson to find Brademan. J. Johnson went upstairs and asked Brademan if she was leaving with them. He went back downstairs when she did not answer. Meanwhile, Warren and Swanstrom carried Deanna Towle out of the house and put her in the van. In anger, Warren punched one of the van's windows and the windows of some cars parked nearby. He punched the windows so hard that he broke a bone in his left hand. According to Swanstrom, he had never seen Warren so upset.

With Deanna Towle, Swanstrom, Doug Towle, and J. Johnson in the van, Warren drove off at a high rate of speed heading to his parents' house. Before they drove away, Swanstrom heard Warren ask Doug Towle to find out who had done this to Deanna Towle. Swanstrom also heard Warren say that he was not going to beat whoever it was with his fist, but was instead going to "put a f* * *ing bullet in his head." J. Johnson testified that he heard Warren say, "I'm going to get the guys," "I am going to shoot them," and "I am going to kill them." During the ride, Doug Towle said, "I bet you it was [Kern]." Warren asked Doug Towle, "Are you with me?," and he said "yeah." Warren said that this was "not a game" and Doug Towle replied, "I know." In their testimony, neither Swanstrom nor J. Johnson remembered Warren saying anything about needing to get back to D. Johnson's house to pick up Brademan.

When they arrived at Warren's parents' house, Swanstrom got out of the van and went to his own car. J. Johnson testified that Warren told Swanstrom, "call my work, because I am going to be in jail tomorrow for killing somebody." Although Swanstrom heard Warren say something as he was leaving, he did not hear what it was. Deanna Towle, Doug Towle, and J. Johnson remained in the van while Warren went into the house. Warren returned carrying a holstered .44 magnum revolver [3] and then drove back toward D. Johnson's house. J. Johnson testified that Warren gave the gun to Doug Towle and asked him to load it, but Doug Towle refused. Following Warren's instructions, Doug Towle did dry fire the gun several times. As he drove, Warren said he wanted to shoot Kern in the face and "get" Moore. Doug Towle told Warren that he should not "get" Running because "he's got a kid on the way." Along the way, J. Johnson asked Warren to drop him off at Running's house, which Warren did by slowing down at an intersection near the house and allowing J. Johnson to jump out of the still moving van. J. Johnson jumped out of the van because he was scared and because Warren threatened him by saying, "you better not tell anybody or I'll come after you."

The three people remaining in the van got back to D. Johnson's house about 4:00 a.m. Although the record does not indicate when or by whom, by the time they got back to D. Johnson's house, the gun was loaded. With the now loaded gun inside Warren's jacket so that it could not be seen, Warren and Doug Towle entered the house, leaving Deanna Towle in the van. They walked into the house, through the living room, into the kitchen, and down to the basement. Running, Witherspoon, Hermanson, and Moore were standing in the kitchen as they went to the basement, but no words were exchanged. Once downstairs, Doug Towle called up to Running telling him to come downstairs. Moore responded, "[Running] f* * *ing jetted." Doug Towle called up to Running again, and Moore again responded, "[Running] f* * *ing jetted." In fact, Running had not left.

3. This gun was a single action revolver. In order to fire it, one has to pull the hammer back all the way and then squeeze the trigger. Once fired, it will not fire again until the hammer has been pulled back and the trigger squeezed.

Running testified that Warren then appeared in the doorway leading from the basement to the kitchen, pulled the gun out while holding it with both hands, and without anything being said, shot Witherspoon in the face.[4] According to the medical examiner, the gun was 6 to 18 inches away when the shots were fired. Witherspoon died instantly. Warren then shot Hermanson twice and Moore twice. The first bullet to strike Hermanson paralyzed his legs causing him to fall on the floor, at which point Warren stood above him and shot him a second time behind the right ear, killing him instantly. As with Hermanson, the first bullet to strike Moore was not instantly fatal. Before being shot the second time, Moore said that he had not done anything and asked Warren not to kill him. Warren then shot Moore in the right nostril and Moore bled to death in a matter of minutes.

After shooting Witherspoon, Hermanson, and Moore, Warren walked out of the kitchen and went upstairs. On his way, Warren fired the gun's last bullet into the window above the upstairs landing and went to the bedroom where he had last seen Brademan. Inside, Brademan, Kern, Durfee, and D. Johnson were hiding. When Warren entered the room, Brademan and D. Johnson fled. Durfee and Kern wrestled the gun away from Warren and then they fled.

After the shootings, Warren, Doug Towle, and Brademan, accompanied by D. Johnson, returned to the van. Warren said to Doug Towle, "Doug, you snaked me." As the group drove to Doug and Deanna Towle's parents' house, Brademan was screaming, crying, and calling Warren a murderer. Warren indicated that he was trying to get Kern and stated that he "don't bullshit" and that he "shot them all right in the head." When Doug Towle asked what they were going to tell the police, Warren replied that he was going to say that someone beat him up and took his gun. When they arrived at the Towle residence, Warren carried Deanna Towle into the house, changed his shirt, and waited until the police arrived.

When the police questioned Warren about his motive for the shootings, Warren told them how he had found Deanna Towle unconscious and undressed in the basement. Warren never told the police officers that he had seen Brademan being raped by Witherspoon. Instead, he told the police that he believed Brademan was in trouble based on what had happened to Deanna Towle and what had happened earlier in the evening to Brademan when she was lying on the floor. At no time did Warren ever tell the police that he did not know the gun was loaded, that he shot Witherspoon accidentally or in self-defense, or that he blacked out after the first shot.

At trial, Warren admitted shooting Witherspoon, Hermanson, and Moore, but claimed that he could not remember any of the statements he allegedly made about wanting to kill whoever had undressed Deanna Towle or about needing Doug Towle's help to do it. However, he did not deny that he made such statements. He also testified that when he left D. Johnson's house heading for his parents' house, he did not realize that Brademan was not in the van and that, upon realizing this, all he could think of was how he had witnessed Brademan being raped, Deanna Towle being abused, and needing to get back to save Brademan.

In his testimony, Warren insisted that he did not know the gun was loaded when he and Doug Towle entered D. Johnson's house and went to the basement. He explained that he was referring to that fact when he said to Doug Towle, "Doug, you snaked me." In describing the actual shootings, Warren testified both that the gun just went off when he was pointing it at Witherspoon and that he acted in self-defense because Witherspoon had reached for the gun. Finally, Warren claimed that after shooting Witherspoon, he blanked out and had no memory of shooting Hermanson and Moore.

In an affidavit submitted by Doug Towle in support of Warren's postconviction petition,

---

4. Warren testified that when he got upstairs, he saw Witherspoon and asked him where Brademan was. Witherspoon allegedly said, "you may have got Deanna [Towle] out of here but you're not getting [Brademan] out. We're not done with her yet." Then, Witherspoon reached for the gun and it went off.

Doug Towle explained that Warren subpoenaed him to testify at Warren's trial, but he refused based on his Fifth Amendment privilege against self-incrimination. According to the affidavit, Doug Towle is now willing to testify because his conviction is final. His affidavit indicates that he would testify that:

> [Warren] was extremely angry about what happened to Deanna [Towle]. When we left [D.] Johnson's house, he was yelling, mumbling, punching windows even when he broke his hand, swearing and then drove like a maniac. On the way back to the house, [Warren] was still extremely upset, but seemed like he was in a different zone. I could tell he was angry; he wasn't saying much, and seemed almost like he was just out of it—not thinking rationally at all. Also, my sister, Deanna Towle, was right next to him in the van, passed out, and a constant reminder of what happened. We knew [Brademan] was still at the house, and told [J.] Johnson that was why we were going back there. * * * I recall just before I heard the shots, I heard some words exchanged from the kitchen area. The words were very challenging, like "What are you going to do about it?" and "She's entertainment for the night."

We first address Warren's contention that the trial court erred when it denied his change of venue motion, which was based on his claim that a fair and impartial jury could not be had in St. Louis County because of pretrial publicity. In seeking the change of venue, Warren identified approximately 18 pretrial newspaper articles as well as other news reports about the murders that he claimed were prejudicial. On appeal he also points to the results of Doug Towle's trial where a change of venue was granted. Doug Towle was indicted on three counts of aiding and abetting murder in the first degree, but was convicted of three counts of aiding and abetting manslaughter in the first degree. Warren argues that had he received a change of venue, as Doug Towle did, he likely would have achieved a result similar to Doug Towle's.

 In denying Warren's change of venue motion, the trial court indicated that Warren could renew the motion after jury selection began. The motion was not renewed. "Where a defendant is granted leave to renew his motion for change of venue immediately before trial, but declines to do so, he waives 'any right he may have had to a change of venue.'"[5] Because Warren did not renew his motion, we conclude that he waived any right he may have had to a change of venue and is not entitled to a new trial on that basis. Further, we are satisfied that the trial court did not abuse its discretion in denying the change of venue.[6]

 In general, a trial should be held in the county where the offense occurred.[7] However, our criminal procedure rules provide that:

> A motion for * * * change of venue shall be granted whenever it is determined that the dissemination of potentially prejudicial material creates a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. A showing of actual prejudice shall not be required.[8]

To receive a new trial based on a trial court's failure to grant a change of venue because of pretrial publicity, the defendant must show that the pretrial publicity "affect[ed] the minds of the specific jurors involved in the case."[9] The mere fact that a juror has been exposed to pretrial publicity is insufficient to show prejudice.[10] "The test is whether a

---

5. *State v. Brom,* 463 N.W.2d 758, 762 (Minn. 1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991) (citing *State v. Knowlton,* 383 N.W.2d 665, 669 (Minn.1986)).

6. *State v. Drieman,* 457 N.W.2d 703, 708 (Minn. 1990) (stating that the trial court has wide discretion in ruling on a change of venue motion and will not be overruled unless a clear abuse of that discretion is shown).

7. *See* Minn. R.Crim. P. 24.01.

8. Minn. R.Crim. P. 25.02, subd. 3.

9. *State v. Fratzke,* 354 N.W.2d 402, 406 (Minn. 1984).

10. *See Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *State v. Kinsky,* 348 N.W.2d 319, 323 (Minn.1984).

prospective juror can set aside his impression or opinion and render an impartial verdict."[11] Pretrial publicity consisting of factual accounts of the crime is insufficient to establish that the publicity was prejudicial.[12] Moreover, the length of time between the publicity and the trial may mitigate any potential prejudice.[13] Further, a defendant may effectively protect himself against the possibility of any prejudicial impact by carefully questioning prospective jurors about the publicity.[14] As a prerequisite to relief on appeal, Warren must prove he "actually was prejudiced by the publicity." [15]

In this case, the trial court determined that the pretrial publicity that Warren identified as prejudicial consisted largely of "factual accounts of events surrounding the incident, biographies of the victims, and community response to the incident." We also note that all of the complained-of publicity, except for one of the newspaper articles, took place in the spring of 1994, approximately 9 months before Warren's trial, and that article was published approximately 6 months before Warren's trial. In addition, during voir dire, the judge, the prosecutor, and the defense attorney questioned each prospective juror individually about their exposure to the pretrial publicity.[16] Fourteen of the fifteen jurors chosen, including alternates, had read one or more newspaper articles or had seen accounts of the murders on television. The remaining juror indicated that her only knowledge of the case was that someone had been arrested in connection with a triple homicide. None of the jurors chosen indicated that they would have any difficulty rendering an impartial verdict. Finally, after voir dire, Warren had three peremptory challenges left.[17] This fact suggests that Warren was satisfied that the jurors selected would be unbiased.[18] For these reasons, we conclude that at the time of Warren's change of venue motion, Warren failed to show that in the absence of a change of venue he could not receive a fair trial. Before this court, Warren has failed to show that pretrial publicity affected the minds of the jurors or that he was actually prejudiced by the publicity.

▮ Further, Warren's argument that had he received a change of venue, as Doug Towle did, he would likely have been convicted of the lesser included-offense of manslaughter in the first degree, has no merit. The fact that it is possible that a different jury may have reached a different result has no bearing on whether Warren received a

**11.** *Kinsky*, 348 N.W.2d at 323 (citing *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639) (additional citation omitted).

**12.** *See State v. Salas*, 306 N.W.2d 832, 835 (Minn.1981); *State v. Thompson*, 266 Minn. 385, 388, 123 N.W.2d 378, 381 (1963) ("The vice of the publicity given this case is not in printing or disseminating factual news but in printing and broadcasting what purports to be the opinions of people who are supposed to know the facts.").

**13.** *See, e.g., Fratzke*, 354 N.W.2d at 407 (7–month interval); *State v. Swain*, 269 N.W.2d 707, 720 (Minn.1978) (6–month interval); *State v. Hogan*, 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973) (3–month interval).

**14.** *See State v. Everett*, 472 N.W.2d 864, 866 n. 1 (Minn.1991); *State v. Beier*, 263 N.W.2d 622, 626 (Minn.1978).

**15.** *Beier*, 263 N.W.2d at 626. Although Warren did not have to show actual prejudice to support his motion to the trial court, he does have to show actual prejudice on appeal. *See id.* Warren argues that he does not have to prove actual prejudice on appeal because this case falls into an exception for cases where massive pretrial publicity gives rise to a presumption of prejudice. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *Sheppard*, the news media printed virulent and incriminating stories about the defendant during the entire pretrial period. *Id.* at 338–42, 86 S.Ct. 1507. The news coverage before Warren's trial did not rise to this level of inflammatory and prejudicial publicity.

**16.** *See* Minn. R.Crim. P. 26.02, subd. 4(2)(b) (providing for individual questioning of jurors).

**17.** *See* Minn. R.Crim. P. 26.02, subd. 6 (providing 15 peremptory challenges to the defendant if the offense is punishable by life imprisonment).

**18.** *See State v. Buschkopf*, 373 N.W.2d 756, 769 (Minn.1985), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (stating that the defendant was satisfied with the jury as selected because no seated juror was challenged for cause and the defendant did not use all of his peremptory challenges).

fair trial. For us to do what Warren suggests, we would be required to make assumptions and engage in speculation as to why Doug Towle's jury reached the verdict it did and what another jury might do at a retrial of Warren. Making such assumptions and engaging in such speculation would be improper on our part. Moreover, it is impossible for us to enter the minds of Doug Towle's jurors. Even if it were possible, we would not. We conclude, therefore, that the trial court did not abuse its discretion in denying Warren's motion for a change of venue.

 Warren next argues that he was denied his constitutional right to present evidence in support of his defense that he was acting in the heat of passion when he shot Witherspoon, Hermanson, and Moore. Warren asserts that the trial court's exclusion of testimony and other evidence about the alleged sexual assaults of Brademan and Deanna Towle prevented him from fully cross-examining the state's witnesses as to their biases and, as a result, the jury did not get a complete picture of what occurred the night of the shootings.

 As with change of venue motions, a trial court has broad discretion in making evidentiary rulings and those rulings will not be reversed absent a clear abuse of discretion.[19] Here, the trial court admitted evidence concerning the sexual assaults on Brademan and Deanna Towle but limited that evidence to those facts that were either perceived by Warren or otherwise made known to him before the shootings. In limiting that evidence, the trial court reasoned that evidence of the sexual assaults, beyond that known or perceived by Warren at the time, could not have provoked him to shoot Witherspoon, Hermanson, and Moore and did not reasonably bear on his state of mind at the time of the shootings. The trial court's reasoning is sound. To establish that he acted in the heat of passion, Warren would have to show that he was "provoked by such words or acts of another as would provoke a person of ordinary self-control un-

der like circumstances."[20] The admission of evidence that was unknown to Warren at the time of the shootings would not have been relevant to his heat-of-passion defense because what he did not know before the shootings could not possibly have provoked him to commit the shootings. Moreover, the evidence of the sexual assaults on Brademan and Deanna Towle that was admitted allowed Warren to present his heat-of-passion defense. At trial, a number of witnesses testified about Brademan being harassed in the living room, and Brademan testified that she was raped by Witherspoon, as well as the fact that Durfee, D. Johnson, Running, Moore, and Kern came into the bedroom and would not allow her to leave. Swanstrom, J. Johnson, and Durfee all testified that they saw Deanna Towle with her sweatshirt up and her pants unbuttoned, and Swanstrom and Durfee testified that Deanna Towle looked like she was passed out at the time. Warren himself testified about Moore's statements referring to Deanna Towle that "maybe I screwed her" and "she's entertainment for the night." We conclude that the trial court did not abuse its discretion in limiting the evidence of the sexual assaults of Brademan and Deanna Towle because the only evidence excluded was evidence that did not bear on Warren's state of mind and because Warren was permitted to and did in fact put in evidence relating to the sexual assaults that did bear on his state of mind at the time of the shootings.

 Next, Warren claims that the postconviction court erred in refusing to grant him a new trial based on the "newly available" testimony of his accomplice, Doug Towle. "A petitioner seeking postconviction relief has the burden of establishing, by a fair preponderance of the evidence, facts which would warrant a reopening of the case."[21] We review postconviction proceedings to determine "whether there is sufficient evidence in the record to sustain the findings

**19.** *See State v. Starkey,* 516 N.W.2d 918, 925 (Minn.1994).

**20.** Minn.Stat. § 609.20(1) (1998).

**21.** *State v. Rainer,* 502 N.W.2d 784, 787 (Minn. 1993).

of the postconviction court."[22] Absent an abuse of discretion, this court will not disturb a postconviction court's decision.[23]

■ In raising his newly available evidence claim, Warren treats newly available evidence as synonymous with newly discovered evidence. We have not had occasion to address the question of entitlement to a new trial based on newly available evidence. Some courts that have addressed the issue, however, have applied the newly discovered evidence test to newly available evidence.[24] Their stated rationale for treating newly available evidence the same as newly discovered evidence is that courts should be cautious in considering evidence from an accomplice who is "unavailable" at trial because such evidence may be untrustworthy,[25] in that a convicted, sentenced accomplice has little to lose, and possibly something to gain, by providing such evidence.[26] Thus, we will apply the newly discovered evidence test to a claim of newly available evidence.

■ In order to obtain a new trial on the ground of newly discovered evidence, a defendant must establish:

> (1) that the evidence was not known to him or to his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to the lack of diligence, (3) that the evidence is material * * *, and (4) that the evidence will probably produce either an acquittal at a retrial or results more favorable to the petitioner.[27]

Warren cannot clear the hurdle of showing that the evidence was unknown to him at the time of trial or that it will "probably produce

an acquittal at a retrial or [a more favorable result.]" According to Doug Towle's affidavit, Warren subpoenaed him to testify but he refused because of the charges pending against him. Thus, even though Doug Towle may have been unavailable to testify at Warren's trial because he invoked the Fifth Amendment, Warren and his counsel knew the substance of the testimony Doug Towle might provide at the time of Warren's trial. In addition, when the essence of Doug Towle's likely testimony is compared to the testimony and other evidence presented at Warren's trial, it is clear that what Doug Towle would have to say would add nothing new at a retrial. At most, Doug Towle's testimony would be cumulative and probably would not produce an acquittal or a more favorable result at a retrial.[28] Simply put, the postconviction court did not abuse its discretion in denying Warren a new trial on the basis of newly discovered evidence.

■ Warren also argues that the evidence presented at his trial did not support his convictions. In reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any evidence in conflict with the result reached.[29] We will uphold the verdict if the jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty of the offense charged.[30]

■ Warren's argument has no merit. Here, the question for the jury was to determine Warren's level of culpability for shoot-

---

22. *Id.*

23. *Id.*

24. *See United States v. Dale*, 991 F.2d 819, 838–39 (D.C.Cir.1993) (citations omitted) ("The unanimous view of circuits that have considered the question is that [the requirement that the evidence has been discovered since the trial] is not met simply by offering the post-trial testimony of a co-conspirator who refused to testify at trial.").

25. *See United States v. Reyes–Alvarado*, 963 F.2d 1184, 1188 (9th Cir.1992).

26. *See United States v. Freeman*, 77 F.3d 812, 817–18 (5th Cir.1996).

27. *Race v. State*, 417 N.W.2d 264, 266 (Minn. 1987) (citations omitted). *See also* Minn. R.Crim. P. 26.04, subd. 1(1)5.

28. *See Schweich v. Ziegler, Inc.*, 463 N.W.2d 722, 731 (Minn.1990), *reh'g denied*, (Minn.1991) (concluding that newly discovered evidence which is cumulative, impeaching, or contradictory does not warrant a new trial).

29. *State v. Atkins*, 543 N.W.2d 642, 646 (Minn. 1996).

30. *Id.*

ing Witherspoon, Hermanson, and Moore. To prove that Warren committed first-degree murder, the state had to show that Warren considered, planned, or determined to kill [31] and that he acted "with intent to effect the death of the person or of another." [32] A review of the trial record establishes that the evidence presented supporting Warren's convictions was substantial, if not overwhelming.

■■■■■■ Warren's final argument is that a number of statements made by the prosecutor during closing argument constitute prosecutorial misconduct requiring a new trial. We will grant a new trial for prosecutorial misconduct "only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that the defendant's right to a fair trial was denied." [33] We need not detail the statements which Warren claims constituted prosecutorial misconduct. It is enough to say that we have carefully reviewed the record and conclude that if any of the statements constituted prosecutorial misconduct, none of them, whether viewed individually or collectively, were so serious or prejudicial as to deny Warren a fair trial. [34]

■■■■■■ We turn now to the state's appeal of Warren's sentence. The state appealed Warren's sentence of three concurrent life sentences to the court of appeals, which dismissed the appeal for lack of jurisdiction. [35] Under Minn.Stat. § 480A.06 (1998), the court of appeals lacks jurisdiction over criminal appeals in cases in which the defendant has been convicted of murder in the first degree.

Therefore, the court of appeals' dismissal of the state's appeal was proper.

■■■■ Our conclusion that the court of appeals is without jurisdiction to hear sentencing appeals in first-degree murder cases does not end our inquiry. Ultimately the question to be answered is whether this court has such jurisdiction. Inherent in our authority under Article VI, § 2 of the Minnesota Constitution, we have jurisdiction to hear such appeals. [36] If we were without such jurisdiction, we would not be able to review the sentence if a trial court were to sentence a defendant for a lesser-included offense of murder even though the defendant had been tried and found guilty of first-degree murder. Nor would we be able to review a trial court's departure from a mandatory life sentence. That would be absurd. In order to perform our judicial function, we must have jurisdiction over all appeals of the sentence imposed in first-degree murder cases. [37]

■■■■■■ Having determined that we have jurisdiction to hear the state's appeal in this case, we turn to its merits. Sentencing is within the discretion of the trial court absent an abuse of discretion. [38] Although the abuse of discretion standard is exacting, it is not a limitless grant of power to the trial court.

■■■■■■ When reviewing a defendant's challenge to the imposition of consecutive sentences for multiple convictions of first degree murder involving more than one victim, we consider whether consecutive sentences are "commensurate with culpability and not an exaggeration of defendant's criminality." [39] We are also guided by past sentences imposed on other offenders. [40] In cases

---

31. *See* Minn.Stat. § 609.18 (1998).

32. Minn.Stat. § 609.185(1) (1998).

33. *State v. Wahlberg,* 296 N.W.2d 408, 420 (Minn.1980) (citations omitted).

34. *See State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (stating that "[i]f the verdict rendered is 'surely unattributable' to the error, then the error is harmless beyond a reasonable doubt and the conviction stands").

35. *See State v. Warren,* No. C0–95–889 (Minn. App. May 24, 1995) (order dismissing appeal).

36. Minn. Const. art. VI, § 2 (providing that the supreme court "shall have * * * appellate jurisdiction in all cases").

37. *See Clerk of Court's Compensation for Lyon County v. Lyon County Comm'rs,* 308 Minn. 172, 179, 241 N.W.2d 781, 786 (1976) (citation omitted) (explaining that we may exercise our inherent judicial power when it is necessary to perform our judicial function).

38. *See Brom,* 463 N.W.2d at 765; *see also* Minn. Stat. § 609.15, subd. 1 (1998).

39. *Bangert v. State,* 282 N.W.2d 540, 547 (Minn. 1979).

40. *State v. Miller,* 488 N.W.2d 235, 241 (Minn. 1992).

where the state challenges the trial court's imposition of concurrent sentences for multiple convictions of first degree murder involving more than one victim, we will consider whether the sentences are commensurate with the defendant's culpability and not an understatement of the defendant's criminality and we will continue to be guided by the sentences imposed on other offenders.

Applying the above principles to the facts of this case, we conclude that the trial court here abused its discretion. In sentencing Warren, the trial court stated on the record that Warren did not have a criminal history, that he was young, and "that there was a degree of provocation * * * not sufficient to justify what he did, but there was a degree of provocation." The trial court evidently considered these facts to be mitigating factors. The trial court did not, at least on the record, consider any aggravating factors. However, severe aggravating factors did exist. There were three victims who were shot at close range under circumstances suggesting that they had no chance to defend themselves. Two of the victims did not die immediately after being shot the first time and were shot a second time—one of them after begging for his life. All of this occurred after Warren drove at least 24 miles to obtain the murder weapon and made clear to his friends that he planned to shoot the victims. These facts, when balanced against the mitigating factors considered by the trial court, lead us to conclude that the trial court's imposition of concurrent sentences was not commensurate with Warren's culpability and understates his criminality. Further, our review of sentences imposed on other offenders with multiple convictions for first degree murder involving more than one victim, leads us to conclude that Warren's concurrent sentences are clearly out of line with sentences imposed on other offenders.[41]

Because the concurrent sentences imposed by the trial court in this case understate Warren's criminality and do not comport with sentences imposed on other offenders for similar offenses, we conclude that the trial court abused its discretion. Therefore, we remand to the trial court for resentencing consistent with this opinion.

Affirmed and remanded for resentencing.

---

41. *See, e.g., State v. Ouk,* 516 N.W.2d 180, 184 (Minn.1994) (15–year–old sentenced to two life sentences and two 180–month sentences to be served consecutively for shooting two clerks and two customers during a robbery); *Miller,* 488 N.W.2d at 239 (three consecutive life sentences for shooting three victims in the head at close range); *Brom,* 463 N.W.2d at 761 (16–year–old

sentenced to three consecutive life sentences and one concurrent sentence for killing four family members with an ax); *State v. Olson,* 291 N.W.2d 203, 205 (Minn.1980) (three consecutive life sentences for burning three people to death); *Bangert,* 282 N.W.2d at 543 (two consecutive life sentences for killing two people while they slept).