**STATE of Minnesota, Respondent,**

v.

**Lincoln Lamar CALDWELL, Appellant,**

and

**Lincoln Lamar Caldwell Appellant,**

v.

**State of Minnesota, Respondent,**

and

**Lincoln Lamar Caldwell Appellant,**

v.

**State of Minnesota, Respondent.**

**Nos. A08–1529, A09–2279, A10–1752.**

Supreme Court of Minnesota.

Aug. 31, 2011.

Rehearing Denied Oct. 5, 2011.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, St. Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Lincoln Caldwell was convicted in Hennepin County District Court of aiding and abetting first-degree premeditated murder for the benefit of a gang. The court sentenced Caldwell to life in prison without any possibility of release. Caldwell has appealed his conviction and the denial of two postconviction petitions and raises five issues in his principal brief. He also raises several arguments in a separate pro se brief. On appeal, Caldwell argues that (1) Minn.Stat. § 609.05, subd. 4 (2010), bars his conviction; (2) there was insufficient evidence of the principal's intent and premeditation to support Caldwell's conviction; (3) there was insufficient evidence that the group of which he was a member met the definition of a gang under Minn. Stat. § 609.229 (2010); (4) he was denied effective assistance of counsel; and (5) newly discovered evidence entitled him to a new trial. We affirm.

In June 2006, 18–year–old Brian Cole lived with his family in North Minneapolis.

He attended North High School, and he planned to graduate after attending summer school in 2006. On the afternoon of June 17, 2006, Cole left his home to attend a "Juneteenth" celebration at Theodore Wirth Park. Approximately ten or fifteen minutes after he left home, Cole's mother heard gunshots. Her husband went outside to investigate. Shortly afterward, her husband ran back into the house, saying, "Brian got shot." Cole's mother ran out of the house to find Cole. She found him lying near the corner of Eighth Avenue North and Penn Avenue, with his eyes closed and his face covered with blood.

The police responded to 911 calls from several bystanders. Minneapolis Police Officer Shannon Barnette was the first officer to arrive at the scene, and rendered emergency aid to Cole. Cole was bleeding profusely from his mouth and nose. An ambulance arrived within two minutes of Barnette's arrival and took Cole to a hospital. Less than an hour later, Cole was pronounced dead.

*Investigation*

Doctor Andrew Baker conducted the autopsy of Brian Cole. Baker testified at trial that Cole was killed by a single bullet, which entered Cole's right shoulder, fractured his collarbone, pierced his right jugular vein and his windpipe, and lodged in the left side of his neck. Baker testified that Cole's wound was fatal because it pierced the jugular vein, leading to massive blood loss and possible asphyxiation from blood inhalation. Baker also testified that he found no alcohol or drugs in Cole's system.

At the scene of the shooting, the police recovered two shell casings made by two different manufacturers—Winchester and CBC. The police were unable to retrieve any fingerprints from the shell casings. Firearms examiner Dana Kloss examined the shell casings and the bullet that was recovered from Cole's body. Kloss testified that the two discharged casings were both from 9 mm caliber shells and that the bullet taken from Cole's body was most likely a .38 caliber bullet. Kloss explained that the .38 caliber family of guns "can include" 9 mm caliber shells and that it was possible the bullet that killed Cole came from one of the two shell casings found at the crime scene.

Two individuals subsequently approached the Minneapolis police with information about Cole's death. The first to contact the police was B.M., who called Lieutenant Nancy Dunlap on July 3, 2006. B.M. was a friend of Cole's and was present at the scene of the shooting. B.M. reported to Dunlap that he had seen an SUV drive past the street corner where he and Cole were standing and that shots were fired from the SUV's window. B.M. reported that he had seen the appellant, Lincoln Caldwell, driving the SUV. The second individual to contact the police was C.P., an acquaintance of Caldwell's. C.P. called the police on July 13 to tell them that Caldwell had bragged about participating in a homicide at Eighth Avenue North and Penn Avenue.

On July 13, 2006, Dunlap contacted Caldwell, and Caldwell gave her his home address. That same day, Dunlap obtained a warrant to arrest Caldwell and search his house. Dunlap carried out the warrant, assisted by several officers. Caldwell was arrested, and the police searched his house. The police found two boxes of ammunition inside a speaker box, neither of which exactly matched the shell casings found at the scene of the shooting. The police also found a photograph of Caldwell and six other men displaying gang signs. Dunlap submitted the boxes of ammunition found in Caldwell's house for fingerprint analysis. No matches were discovered.

*Prosecution and Trial*

Caldwell, who was driving the SUV from which Cole was shot, was indicted on six counts of aiding and abetting murder under Minn.Stat. § 609.05 (2010):(1) first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2010); (2) first-degree premeditated murder for the benefit of a gang in violation of Minn.Stat. § 609.185(a)(1) and Minn.Stat. § 609.229 (2010); (3) first-degree drive-by murder in violation of Minn.Stat. § 609.185(a)(3) (2010); (4) first-degree drive-by murder for the benefit of a gang in violation of Minn.Stat. § 609.185(a)(3) and Minn.Stat. § 609.229; (5) second-degree drive-by murder in violation of Minn.Stat. § 609.19, subd. 1 (2010); and (6) second-degree drive-by murder for the benefit of a gang in violation of Minn.Stat. § 609.19, subd. 1(2) and Minn.Stat. § 609.229, subds. 2, 3. At trial, in addition to the information above, the State introduced testimony from several other individuals who were either present at the scene of the shooting or involved in the shooting.

Two friends of Cole's who were with him on the afternoon of the shooting testified. E.F. testified that Cole was his best friend. On the day of the shooting, E.F. met with Cole when Cole was sitting at the corner of Eighth Avenue North and Penn Avenue and talking with a group of about ten people. E.F. recognized one of the people to whom Cole was talking as a person named "Cash." Cash was a member of a gang known as the "One–Nine gang." After E.F. and Cole talked for a while, E.F. left. A few minutes later, E.F. saw a red Chevrolet SUV "moving quickly" in an easterly direction across Oliver Avenue. He then heard four shots but assumed that it was "Cash" or another group member "act[ing] dumb," so he kept walking. Shortly afterward, E.F. received a telephone call from a person who told him that Cole had been shot.

P.P. was also a friend of Cole's. P.P. met with Cole at the intersection of Eighth Avenue North and Oliver Avenue on the day of the shooting. He testified that two members of the One–Nine gang—"Willy" Watkins, also known as "Ill Will," and "Cash"—were in the group with Cole on the corner. P.P. witnessed Cole's shooting, and like B.M., saw that Caldwell was driving the SUV out of which the shots were fired. P.P. also testified that before Cole's funeral, he and some of Cole's other friends went to the Brookdale Shopping Mall and made t-shirts that showed the newspaper article reporting Cole's death. P.P. also testified that Caldwell spoke to him while he was at the Brookdale Mall, and said: "I'm the reason why you got that shirt."

Several individuals who were with Caldwell at the time of the shooting also testified. These individuals were William Brooks, Troy Young, Cey Barber, and Carnell Harrison (Carnell), who is Kirk Harrison's brother. With the possible exception of Brooks and Carnell,[1] all were members of a group called the "LL" gang, along with Kirk Harrison.[2] The "LL" gang was named after the intersection of Lowry Avenue and Lyndale Avenue in Minneapolis, the area where the gang's territory was located. Brooks also testified that the "LL" gang "had a problem" with the "One–Nine" gang—the gang of which Cole's alleged companions on the day of the shooting, "Cash" and "Ill Will," were members.

---

**1.** Brooks and Carnell denied being members of the "LL" gang, but other testimony suggests they were members.

**2.** Brooks did not know that Cey Barber was a member of the "LL" gang, but Barber's testimony confirms that he was a member.

Brooks testified that on the day of the shooting, Caldwell was driving around in his SUV with Brooks, Kirk Harrison, Young, Barber, and Carnell. Brooks said that the group saw 15 to 20 people standing around at Eighth Avenue North and Penn Avenue, whom Caldwell identified as members of the "One–Nine" gang. Brooks testified that Caldwell's group left the SUV near the "One–Nine" gang members, but that "people [on the street] started getting rowdy," and that the members of Caldwell's group were concerned for their own safety. The members of Caldwell's group got back into the SUV and drove around the block. As they did so, Caldwell and Kirk Harrison remarked that members of the "One–Nine" gang had shot at them earlier and that they were going to get [the 'One–Nines']." Caldwell then passed a gun to Kirk Harrison, who was sitting in the rear passenger seat directly behind Caldwell. As the SUV drove back toward Oliver Avenue, Kirk Harrison leaned out a window and attempted to fire the gun. Initially the gun did not work because the safety was on, but Kirk Harrison took off the safety and shot six or seven times into the crowd. Brooks saw one of the men in the group get "hit in the face."

Carnell, a probable "LL" gang member, also testified. Carnell testified that on the afternoon of the shooting, he, his brother Kirk Harrison, Caldwell, and Caldwell's girlfriend picked up Young, Barber, and Brooks. After dropping off Caldwell's girlfriend, the group drove to Penn Avenue. Carnell testified that before dropping off Caldwell's girlfriend, Caldwell gave a gun to Kirk Harrison, because Caldwell did not want the police to find it in his possession.

Carnell testified that Caldwell and Kirk Harrison had made an earlier attempt to shoot at some "One–Nine" gang members.

When Caldwell and his group arrived at Eighth and Oliver, Carnell saw the group in which Cole was standing, and heard one of Caldwell's companions say that the group on the street consisted of members of the "One–Nine" gang. Carnell heard Caldwell or Kirk Harrison say, "There go Kill Will." At this point, Carnell testified that the group including Caldwell and Kirk Harrison got out of the SUV, and one of the two of them said, "[We] can catch them over there." Carnell testified that he assumed that Caldwell and Kirk Harrison were going to "go shoot at the ['One–Nines']."

Carnell testified that he left Caldwell's group for a few minutes. When he got back to the group, he heard Kirk Harrison tell Caldwell "you should have took the shot." Caldwell responded that "it was too crowded." They got back into the SUV, and then drove past the group of alleged "One–Nine" gang members. The next thing Carnell heard was a shot, and when he looked up, he saw Kirk Harrison shooting out of the SUV's window. Carnell testified that the gun that Kirk Harrison was firing was the same gun that Caldwell had handed to Kirk Harrison earlier.

Carnell also gave general testimony about the "LL" gang. He testified that the "LL" gang had a hand signal, which consisted of holding up two hands to show two letter L's with the thumb and four fingers. Carnell also testified that the "LL's" sell drugs, including crack cocaine. He testified that the "LL's" protect their territory by fighting with or shooting at members of other gangs that come into their territory, and that they sometimes engaged in shoot-outs with other gangs including the "One Nines." The State also introduced the photograph recovered at Caldwell's house. Carnell confirmed that Caldwell was in the picture, and was showing the "LL" gang sign with one hand.

Troy Young, another member of the "LL" gang who was riding in Caldwell's SUV on the day of the shooting, also testified. Young said that he heard a shot from outside the SUV, and ducked. Shortly afterward, Young, who was sitting to the right of Kirk Harrison, heard shots being fired to his left. When the shooting stopped, Young looked up and he saw a grey handgun in Kirk Harrison's hand.

Cey Barber testified that the "LL" gang had a hand gesture. Barber also testified that "LL" members sold drugs, including "weed" and crack cocaine and that "LL's" retaliated against other gangs who intruded upon their territory by "mess[ing] with their girls" and by using weapons. Barber testified that he was with Caldwell's group on the afternoon of the shooting, and saw "Ill Will" in the other group. Barber "heard some shots," "put his head down," and then heard Kirk Harrison fire some shots.

Two other friends of Caldwell's who were not present at the shooting testified that Caldwell subsequently spoke with them about the shooting incident. S.T. testified that Caldwell had told him that Caldwell had "got down with One–Nines," and agreed that "Ill Will" was the "intended target." According to S.T., "Ill Will" was a leader of the "One–Nines." S.T. said that Caldwell told S.T. that he "used a grey and black 9mm Smith & Wesson" semiautomatic handgun, without explicitly explaining for what the gun was used. S.T. also testified that gang members received a "higher rank," within the gang, "publicity," and "street credibility" from telling people about crimes that they had committed and that people thought of killers as "tough."

C.P. testified that he spoke with Caldwell about the Cole shooting on July 8 or 9, 2006. On this occasion, C.P., Caldwell, and a couple of other people were "drinking and getting high, playing a little basketball." C.P. testified that Caldwell said, apparently out of the blue, "[We] shouldn't have did it. We ain't going to get no points for it. Dude was a nobody." C.P. also testified that Caldwell had thought originally that the victim was "One–Nine Mook"—a "One Nine" gang member with whom Caldwell shared a nickname and with whom he had a particularly strong rivalry. C.P. explained that "[w]hen you kill somebody, you want to get recognized about it."

The jury found Caldwell guilty on all six counts of the indictment. The district court subsequently convicted him of first-degree murder for the benefit of a gang and sentenced him to life in prison without the possibility of release.

Kirk Harrison was also prosecuted for the death of Cole. At a bench trial, a Hennepin County judge convicted Kirk Harrison of unintentional murder in the second degree for causing death while committing the felony crime of drive-by murder. The judge found that the State had failed to prove that Kirk Harrison had the intent to cause the death of another, or that the "LL's" met the statutory definition of a gang. The judge found Kirk Harrison not guilty of all other offenses.

Caldwell filed a direct appeal of his conviction with our court on September 2, 2008. On May 7, 2009, we granted Caldwell's motion to stay his direct appeal for purposes of filing a postconviction motion. Caldwell, represented by new counsel, filed his first postconviction petition on June 5, 2009, alleging that: (1) the doctrine of nonmutual collateral estoppel barred his conviction; and (2) he was denied the effective assistance of counsel. Caldwell also raised several arguments in his pro se supplemental brief. On October 2, 2009, the postconviction court denied Caldwell's petition. Caldwell filed a notice

of appeal with our court from the denial of his postconviction petition on December 18, 2009. On March 2, 2010, Caldwell again requested, and we granted, a stay of appellate proceedings for the purpose of filing a second postconviction petition. In his second petition for postconviction relief, Caldwell alleged that he was entitled to an evidentiary hearing on the basis of newly discovered evidence. The postconviction court denied Caldwell's second postconviction petition on August 11, 2010. Caldwell then filed a notice of appeal from the denial of his second postconviction petition. We vacated the stays of Caldwell's direct appeal and the appeal from the denial of his first postconviction petition, and consolidated all three appeals.

## I.

Caldwell first argues that Minn.Stat. § 609.05, subd. 4, bars his conviction for aiding and abetting first-degree murder when Kirk Harrison, the principal party who fired the shots that killed the victim, was acquitted of first-degree murder.[3] The State argues that Minn.Stat. § 609.05, subd. 4, explicitly authorized Caldwell's conviction notwithstanding Kirk Harrison's acquittal of first-degree murder. This issue presents a question of statutory interpretation, which we review de novo. *State v. Hester*, 796 N.W.2d 328, 331 (Minn. 2011).

The object of all statutory interpretation is to ascertain and effectuate the intention of the Legislature. Minn.Stat. § 645.16 (2010). When the words of a law in their application to an existing situation are clear and unambiguous, we apply the plain meaning of the statute. *Id.* A statute is ambiguous if its language is subject to

more than one reasonable interpretation. *State v. Vue*, 797 N.W.2d 5, 17 (Minn.2011). We will not supply words that the Legislature either purposely omitted or inadvertently left out. *Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 681 (Minn.2004).

Under Minn.Stat. § 609.05, subd. 4,

[a] person liable [for the crimes of another] may be charged with and convicted of the crime although the person who directly committed it has not been convicted, or has been convicted of some other degree of the crime or of some other crime based on the same act.

In this case, Caldwell was convicted for the crime of another under Minn.Stat. § 609.05. Kirk Harrison, the person who "directly committed" the crime, was convicted of second degree murder—"some other degree of the crime" for which Caldwell was convicted. *See id.* Moreover, Caldwell was convicted of a crime based on the same act as the crime for which Kirk Harrison was convicted—the drive-by shooting of Brian Cole. Therefore, Caldwell's conviction for first-degree murder is explicitly permitted by the plain language of Minn.Stat. § 609.05, subd. 4. Moreover, we have indicated that the acquittal of a principal does not bar conviction of a defendant for aiding and abetting in *State v. Cegon*, saying, "the fact that a different jury subsequently acquitted the man he was accused of aiding and abetting would not render defendant's conviction for aiding and abetting improper." 309 N.W.2d 313, 314 (Minn.1981) (citing Minn.Stat. § 609.05, subd. 4).

Caldwell nevertheless argues that because the acquittal of a principal for the

---

**3.** Caldwell referred to the common law doctrine of nonmutual collateral estoppel in his brief. But at oral argument, Caldwell's counsel clarified that his argument was limited to the interpretation of Minn.Stat. § 609.05, subd. 4. Therefore, we confine our analysis to this issue.

same crime is not explicitly mentioned in Minn.Stat. § 609.05, subd. 4, an acquittal is impliedly excluded from the reach of section 609.05, subdivision 4, by the doctrine of *expressio unius est exclusio alterius.* *See* Minn.Stat. § 645.19 (2010) (codifying *expressio unius* ). Caldwell asserts that an acquittal is impliedly excluded because the term "acquitted" is not among the terms describing the circumstances under which a defendant may be convicted for the crimes of another—the principal has not been convicted, the principal has been convicted for another degree of the same crime, or convicted for another crime based on the same act. He argues that the exclusion of the term "acquitted" implies that the Legislature intended to prohibit conviction of a defendant when the principal was *acquitted* of the same charge. The State does not explicitly address Caldwell's *expressio unius* argument but asserts that our decision in *Cegon* controls this case.

▪ The doctrine expressio unius est exclusio alterius means that the expression of one thing is the exclusion of another. *In re Welfare of J.B.,* 782 N.W.2d 535, 543 (Minn.2010); *In re Common Sch. Dist. No. 1317,* 263 Minn. 573, 575, 117 N.W.2d 390, 391 (1962). *Expressio unius* generally reflects an inference that any omissions in a statute are intentional. 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 47.25 (7th ed.2007). Accordingly, use of the doctrine is only justified when the language of the statute supports such an inference. *Id.*; *see United Dominion Industries, Inc. v. United States,* 532 U.S. 822, 836, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001). As the United States Supreme Court has said, "[W]e do not read the enumeration of one case to exclude another unless it is fair to suppose that [the legislative branch] considered the unnamed possibility and meant to say no

to it." *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003).

▪ Here, Caldwell fails to offer any convincing reason why we should infer that the Legislature intended to omit an acquittal of the principal for the same offense as the defendant from Minn.Stat. § 609.05, subd. 4. The omitted term "acquittal" is entirely consistent with, and encompassed by, the language in all three of the enumerated circumstances—no conviction, conviction of some other degree of the same crime, and conviction of some other crime based on the same act. Therefore, an acquittal has not, in fact, been excluded—rather, it is implicitly expressed by the enumerated terms of the statute. It is therefore unreasonable to conclude that the Legislature intended to make acquittal of the principal an exception to language permitting conviction for aiding and abetting in Minn.Stat. § 609.05, subd. 4. The far stronger inference is that the Legislature recognized that an acquittal of the principal was provided for by other statutory language and omitted the term for that reason and that reason alone. In short, the inference that *expressio unius est expressio alterius* describes—that the omission of a term from other enumerated terms implies the exclusion of the omitted—is not justified when the omitted term is encompassed by the enumerated terms. Accordingly, we conclude that under Minn.Stat. § 609.05, subd. 4, Caldwell's conviction for first-degree murder is permitted notwithstanding the first-degree murder acquittal of Kirk Harrison—the person who fired the shots that killed the victim.

## II.

▪ Caldwell's second argument is that the State did not prove beyond a reasonable doubt that Kirk Harrison had the

necessary premeditation and intent to commit first-degree murder, and therefore there was insufficient evidence to support Caldwell's conviction for aiding and abetting that crime. The Fourteenth Amendment right to due process and the Sixth Amendment right to trial by jury, taken together, entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, and the determination must meet the "beyond a reasonable doubt" standard of proof. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *State v. Peterson*, 673 N.W.2d 482, 486 (Minn.2004); *see also* U.S. Const. amends. VI, XIV.

■ In considering the sufficiency of the evidence, our review is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the verdict, is sufficient to allow the jurors to reach the verdict that they did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). We must assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

Caldwell was convicted of aiding and abetting first-degree intentional murder for the benefit of a gang under Minn.Stat. § 609.185(a)(1), Minn.Stat. § 609.229, and Minn.Stat. § 609.05. Conviction for this offense requires, among other things, that the State prove that the principal—in this case, Kirk Harrison—acted with the intent to kill and the killing was premeditated. Minn.Stat. § 609.185(a)(1). Intent means that the defendant "either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(4) (2010). Premeditation means

"to consider, plan or prepare for, or determine to commit the act referred to prior to its commission." Minn.Stat. § 609.18 (2010).

■ Here, there was sufficient evidence from which the jury could have inferred that Kirk Harrison acted with intent to kill and the killing was premeditated. There was evidence that Kirk Harrison was a member of the "LL" gang, and that the "LL" gang occasionally exchanged gunfire with the "One–Nine" gang. There was also evidence that Kirk Harrison and his friends believed that the group that they were approaching was a group of "One–Nine" gang members, and that a fight was imminent. There was evidence that members of the "One–Nines" had shot at Kirk Harrison and Caldwell sometime before the day when Cole was killed. The jury heard from Brooks that Caldwell and Kirk Harrison said that they were "going to get them." Carnell testified that "One–Nine" leader "Ill Will" was in Cole's group and was the target of the shooting. Carnell also testified that his brother Kirk Harrison said that he "got into it" with "Ill Will."

Carnell testified further that a few minutes before the shooting, Kirk Harrison and Caldwell said that "we can catch them over there," by which Carnell understood that Caldwell and Kirk Harrison were going to go shoot at "One–Nine" gang members. The jury also heard that Kirk Harrison told Caldwell that Caldwell should have "took the shot." Brooks testified that Kirk Harrison leaned out of the SUV window as the SUV was moving and fired into Cole's group. Initially, the gun's safety was on, and the gun did not fire. Kirk Harrison disengaged the safety, and pulled the trigger again, firing into the crowd. There was evidence that Kirk Harrison

fired several shots and later told S.T. that his "intended target" was "Ill Will."

The jury could have inferred from the evidence at trial that Kirk Harrison had a rivalry with "Ill Will," that he tried earlier in the day to shoot "Ill Will," and that he believed he was shooting at "Ill Will" when he fired into Cole's group. Based on the record before us, we conclude that there was sufficient evidence that Kirk Harrison had the requisite premeditation and intent to support Caldwell's conviction of aiding and abetting first-degree murder.

### III.

Caldwell's third argument is that the State did not prove beyond a reasonable doubt that the "LL's" met the statutory definition of a gang. Again, in considering the sufficiency of the evidence, we review the evidence in the light most favorable to the conviction. *Webb*, 440 N.W.2d at 430.

■■■■ Caldwell was convicted of aiding and abetting first-degree murder for the benefit of a gang under Minn.Stat. § 609.185 and Minn.Stat. § 609.229. A gang is defined as:

> any ongoing organization, association, or group of three or more persons, whether formal or informal, that:
>
> (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subd. 9;
>
> (2) has a common name or common identifying sign or symbol; and
>
> (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Minn.Stat. § 609.229, subd. 1. Therefore, to sustain Caldwell's conviction, the State had to show that the "LL" gang is (1) a group of three or more persons, (2) has as its primary activity the commission of one or more of the offenses listed in Minn.Stat. § 609.11, subd. 9 (2010),[4] (3) has a common name or symbol, and (4) includes members who have engaged in a pattern of criminal activity.

Caldwell does not dispute that the "LL" gang is a group of three or more people, and that they have a common identifying sign or symbol. Several witnesses testified that at least three of the occupants of Caldwell's SUV were members of the "LL" gang. There was also testimony that the "LL" gang had a common name and common identifying sign, which consisted of a hand gesture making the letter L. Therefore, the only remaining criteria are (1) whether the "LL" gang has, as one of its primary activities, the commission of one or more of the section 609.11, subdivision 9, offenses; and (2) whether it includes members who engage in a pattern of criminal activity.

The State introduced evidence that the "LL's" had, as a primary activity, the commission of several of the section 609.11, subdivision 9, offenses. Specifically, the State introduced evidence in the form of testimony from Barber and Carnell that the "LL's" sold drugs on their territory. Brooks also testified that "LL's" sold drugs. The State also introduced evidence that the "LL's" shot at opposing gang members who intruded on the "LL's" territory. These activities constitute sufficient evidence for a jury to infer that the "LL's" had as a primary activity the com-

---

4. These offenses are murder, assault, burglary, kidnapping, false imprisonment, manslaughter, robbery, witness tampering, criminal sexual conduct, escape from custody, arson, drive-by shooting, stalking, possession of a firearm, a felony violation of chapter 152 (setting out offenses relating to drugs and controlled substances), or an attempt to commit any of these crimes. Minn.Stat. § 609.11, subd. 9.

mission of one or more section 609.11, subdivision 9, offenses.

Similarly, it appears that there was sufficient evidence for the jury to conclude that the "LL" gang included members who engaged in a pattern of criminal activity. There was evidence that Barber and Carnell sold drugs on the gang's territory; and as previously noted, the "LL" gang had a pattern of shooting at members of other gangs who entered "LL" territory. These activities constitute sufficient evidence from which a jury could infer that the "LL's" included members who engaged in a pattern of criminal activity. For all the foregoing reasons, we conclude that there was sufficient evidence for the jury to infer that the "LL's" met the statutory definition of a gang. Therefore, we conclude that there was sufficient evidence to support Caldwell's conviction of aiding and abetting first-degree murder for the benefit of a gang.

## IV.

■ Caldwell's fourth argument is that he was denied his right to effective assistance of counsel because (1) his counsel's performance at voir dire was unreasonable, and (2) lack of contact with his counsel prevented him from having a meaningful attorney-client relationship. We review claims of ineffective assistance of counsel de novo. *Williams v. State,* 764 N.W.2d 21, 29–30 (Minn.2009); *Opsahl v. State,* 677 N.W.2d 414, 420 (Minn. 2004).

■ Both the United States Constitution and the Minnesota Constitution provide that the accused in a criminal prosecution is entitled to the assistance of counsel. U.S. Const. amend. VI; Minn. Const. art. I, § 6. To establish ineffective assistance of counsel, the defendant must show that (1) counsel's performance fell below an objective standard of reasonable-

ness, and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors. *State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003) (quoting *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998)). Trial counsel's performance is presumed to be reasonable. *Schneider v. State,* 725 N.W.2d 516, 521 (Minn.2007). Under the first prong, trial counsel's performance is objectively reasonable when counsel exercises the "customary skills and diligence" that a reasonably competent attorney would exercise under the circumstances. *Opsahl,* 677 N.W.2d at 421 (quoting *State v. Gassler,* 505 N.W.2d 62, 70 (Minn.1993)). To show prejudice under the second prong, the defendant must demonstrate that counsel's performance undermined confidence in the trial outcome because, but for the errors, the result of the proceeding probably would have been different. *Rhodes,* 657 N.W.2d at 842.

### *Voir Dire*

Caldwell asserts that he was denied effective assistance of trial counsel when his counsel failed to effectively conduct voir dire. Ineffective representation is not established by complaining that counsel failed to challenge certain prospective jurors unless the failure to challenge the prospective jurors "essentially amounts to a denial of counsel." *Williams,* 764 N.W.2d at 30. Caldwell asserts that his counsel's questioning of prospective jurors was perfunctory, and that his counsel should have asked questions even if he knew that he would use a peremptory challenge. Caldwell asserts that the questions should have been asked in the hope of finding cause to excuse prospective jurors and thereby preserving as many peremptory challenges as possible.

■ Caldwell's trial counsel appears to have been well prepared during voir dire.

Each prospective juror received and filled out a questionnaire that had 91 questions. Caldwell's counsel demonstrated on several occasions that he had read the questionnaires, and asked about some of the answers in more depth. For example, the first prospective juror started to write an answer and then scratched it out. Caldwell's counsel asked the prospective juror about this question. Caldwell's counsel also was prepared with a list of a number of prospective jurors whom he intended to strike. Counsel did assert Caldwell's right to strike jurors for cause on several occasions—sometimes successfully, and sometimes unsuccessfully. Given this course of conduct, we conclude that Caldwell has not rebutted the presumption that his counsel's performance was reasonable. *Schneider,* 725 N.W.2d at 521.

Moreover, Caldwell fails to assert or demonstrate that any particular juror should have been stricken. It appears that Caldwell's trial counsel reviewed all questionnaires and determined that his existing peremptory challenges were sufficient without attempting more challenges for cause. We conclude that Caldwell has failed to demonstrate prejudice resulting from his counsel's performance in voir dire. *Cf. Krutilek v. Kenney,* 125 Fed. Appx. 93, 95 (8th Cir.2005) (holding failure to follow up on jurors' questions and attempt to remove jurors for cause was not grounds for reversal where prejudice was not shown). We therefore conclude that the district court did not err when it concluded that Caldwell was not denied effective assistance of counsel by his counsel's performance during voir dire.

*Attorney–Client Relationship*

 Caldwell also argues that he was denied effective assistance of counsel by the lack of any meaningful attorney-client relationship. The United States Supreme Court has rejected "the claim that

the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). The Court also held in *Morris* that two meetings between the defendant and a public defender who had been appointed six days before trial did not constitute grounds for finding ineffective assistance of counsel. *Id.* In *Chambers v. Maroney,* 399 U.S. 42, 53–54, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Court held that the fact counsel was appointed only a few minutes before trial was not error. Therefore, it appears that limited trial preparation time does not alone constitute grounds for establishing ineffective assistance of counsel. Instead, "[t]he proper focus ... should be on the adversarial process rather than the defendant's assessment of his lawyer's preparation." *Dillon v. Duckworth,* 751 F.2d 895, 899 n. 3 (7th Cir.1984).

Caldwell argues that his counsel's performance was inadequate because his counsel consulted with him only three times. But as we have discussed, the number of attorney-client consultations does not alone demonstrate inadequate representation. *See Morris,* 461 U.S. at 13–14, 103 S.Ct. 1610. Moreover, it appears that Caldwell's counsel advised him competently. Caldwell stated in his affidavit that he reviewed with his counsel which witnesses would testify on Caldwell's behalf. They also discussed Caldwell's desire to reject a plea offer, to have a speedy trial, and to testify on his own behalf. Further, it appears from the record that Caldwell's counsel was well prepared and conducted a competent defense. Counsel cross-examined witnesses and presented an alternative theory of the case to the jury. As Caldwell's affidavit confirms, counsel sent an investigator to meet with Caldwell "a few times" to obtain informa-

tion from Caldwell about the case. Finally, Caldwell also stated, in response to questioning from the district court, that he did not wish to retain new counsel. Therefore, the record does not indicate any deficiency in the relationship between Caldwell and his counsel that would establish a claim for ineffective assistance of counsel.

Even if Caldwell's counsel's performance were deficient, Caldwell has not demonstrated that he suffered prejudice. *Rhodes,* 657 N.W.2d at 842. He argues that prejudice is demonstrated by the fact that Kirk Harrison was acquitted of the offense for which Caldwell was convicted. But different results alone do not support an inference that Caldwell's counsel's performance prejudiced him. *See Morgan v. State,* 384 N.W.2d 458, 460–61 (Minn.1986). Caldwell has not otherwise indicated how specifically he was prejudiced by his relationship with his counsel. *See United States v. Williams,* 562 F.3d 938, 942 (8th Cir.2009) (holding that prejudice was not demonstrated where defendant failed to identify how further meetings would have resulted in different strategies at trial). Given the actions of Caldwell's trial counsel, we conclude that Caldwell was not denied effective assistance of counsel at his trial.

## V.

Caldwell's fifth argument is that he is entitled to an evidentiary hearing on the basis of newly discovered evidence. Specifically, he has offered an affidavit from an investigator who states that both Kirk Harrison and Barber reported that Caldwell had no knowledge that there was a gun in the SUV. The postconviction court concluded that Caldwell knew of Kirk Har-

rison's and Barber's testimony at trial. The court also concluded that Kirk Harrison's testimony was unlikely to make a difference at trial because Kirk Harrison's testimony contradicted his statements to the police, and Barber's testimony was unpersuasive. On appeal, Caldwell argues that the postconviction court erred when it concluded that Kirk Harrison's newly discovered evidence did not entitle Caldwell to a hearing.[5]

When reviewing a postconviction court's denial of relief, issues of law are reviewed de novo. *Leake v. State,* 737 N.W.2d 531, 535 (Minn.2007). A petitioner is entitled to an evidentiary hearing if he has alleged facts that would, if proved by a fair preponderance of the evidence, entitle him to relief. *Wayne v. State,* 747 N.W.2d 564, 565 (Minn.2008); *see also* Minn.Stat. § 590.04 (2010). We have said that an evidentiary hearing is required " 'whenever material facts are in dispute that ... must be resolved in order to determine the issues raised on the merits.' " *Doppler v. State,* 771 N.W.2d 867, 871 (Minn.2009) (alteration in original) (quoting *Ferguson v. State,* 645 N.W.2d 437, 446 (Minn.2002)). The allegations must be "more than argumentative assertions without factual support." *Id.* at 871. Any doubts about whether an evidentiary hearing is necessary should be resolved in favor of the party requesting the hearing. *State ex rel. Roy v. Tahash,* 277 Minn. 238, 244, 152 N.W.2d 301, 305 (1967).

A petitioner who seeks a new trial on the grounds of newly discovered evidence must show: (1) that the evidence was not known to the defendant or his/her counsel at the time of trial; (2) that the

---

5. Caldwell does not argue on appeal that the district court erred when it denied a hearing on the basis of Barber's testimony; therefore, we do not consider Barber's testimony on

appeal. *See State v. Swaney,* 787 N.W.2d 541, 551, n. 4 (Minn.2010) (concluding issue not raised on appeal would not be considered).

evidence could not have been discovered through due diligence before trial; (3) that the evidence is not cumulative, impeaching, or doubtful;[6] and (4) that the evidence would probably produce an acquittal or a more favorable result. *Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997). In order for postconviction relief to be granted on the basis of newly discovered evidence, a petitioner must satisfy all prongs of the *Rainer* newly discovered evidence test. *Whittaker v. State,* 753 N.W.2d 668, 671 (Minn.2008).

■■■ Under the first prong of the *Rainer* test, we must determine whether the newly discovered evidence was known to the defendant or his counsel at the time of the trial. We have said that testimony is not unknown to the petitioner when a potential witness is present at the scene of the crime with the petitioner, and the petitioner knows the substance of the testimony that the witness might provide. *Scherf v. State,* 788 N.W.2d 504, 508–509 (Minn. 2010) ("Scherf admittedly knew the witness existed at the time of trial and knew the substance of what the witness would have testified to.... [W]e conclude that the district court did not abuse its discretion...."); *Whittaker,* 753 N.W.2d at 672 (holding that when petitioner was with witness on the night of the murder, petitioner was aware of the substance of witness's testimony); *Pierson v. State,* 637 N.W.2d 571, 577 (Minn.2002) ("Pierson and Smith

were together throughout the events.... Thus, Pierson undoubtedly knew that Smith had information regarding Pierson's involvement."). In the case before us, it is undisputed that Caldwell was with Kirk Harrison at the time of the shooting; thus, he was aware that Kirk Harrison might testify that Caldwell was unaware of the presence of the gun in the SUV, if in fact, Caldwell *was* unaware of the presence of the gun in the SUV. Therefore, we conclude that Caldwell is not entitled to an evidentiary hearing because he has not satisfied the first prong of the newly discovered evidence test.

## VI.

Caldwell raises seven additional arguments in his pro se supplemental brief. He argues: (1) his constitutional rights were violated when he was denied a competency hearing; (2) his constitutional rights were violated when the district court removed his mother from the courtroom before trial and locked the courtroom doors during jury instruction; (3) the district court abused its discretion when it allowed inadmissible hearsay; (4) the district court abused its discretion when it instructed the jury on transferred intent; (5) the district court failed to instruct the jury on accomplice testimony; (6) the district court failed to instruct the jury on the relevancy of the circumstantial evidence instruction; and (7) the district court vio-

---

**6.** Caldwell cites *State v. Warren,* 592 N.W.2d 440, 450 (Minn.1999), as the source of the newly discovered evidence test instead of the more frequently used test in *Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997). The tests in *Warren* and *Rainer* differ in their articulation of the third prong. *Rainer* requires "that the evidence is not cumulative, impeaching, or doubtful." 566 N.W.2d at 695. *Warren* requires "that the evidence is material...." 592 N.W.2d at 450. *Warren* relied on *Race v. State,* 417 N.W.2d 264, 266 (Minn.1987), for its articulation of the test. *Race* requires

"that the evidence is material (or, as we have sometimes said, is not impeaching, cumulative, or doubtful)." *Id. Warren* included the language "or, as we have sometimes said, is not impeaching, cumulative, or doubtful" with ellipses. 592 N.W.2d at 450. This truncated recitation of our test in *Warren* does not remove "not cumulative, impeaching, or doubtful" from what must be proved. Thus, Caldwell must prove "that the evidence is not cumulative, impeaching, or doubtful" under either articulation.

lated Caldwell's constitutional rights when it imposed restitution. We examine each argument in turn.

## Competency Hearing

■ Caldwell claims that his constitutional rights were violated when he was denied a competency hearing. The Supreme Court has said that it is a denial of due process of law to subject to trial a person who is incompetent to assist in his or her defense or to understand the proceedings. *See Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *see also State v. Hunt,* 615 N.W.2d 294 (Minn.2000). Under Minn. R.Crim. P. 20.01, subd. 3: "If the prosecutor, defense counsel, or the court, at any time, doubts the defendant's competency, the prosecutor or defense counsel must make a motion challenging competency, or the court on its initiative must raise the issue." Here, the district court questioned Caldwell on the record, and Caldwell confirmed that he did not have any serious mental illness. Further, there is no other evidence in the record that supports a claim that Caldwell was not competent to stand trial.

## Public Trial

■ Caldwell argues that the district court denied his constitutional right to a public trial when it excluded his mother from the courtroom before trial began after she made several disruptive remarks during courtroom proceedings. The court also locked the courtroom doors before instructing the jury. Both the United States and Minnesota Constitutions and Minnesota law provide that the accused shall have the right to a public trial. U.S. Const. amend. VI; Minn. Const. art. 1, § 6; *State v. Schmit,* 273 Minn. 78, 139 N.W.2d 800 (1966). But we have recognized that "a trial court may, in the appropriate exercise of its discretion, exclude spectators when necessary to preserve or-

der in the courtroom." *State v. Ware,* 498 N.W.2d 454, 458 (Minn.1993). We have also held that the "values sought to be protected by a public trial" are protected when not all spectators are excluded from the courtroom. *State v. Lindsey,* 632 N.W.2d 652, 661 (Minn.2001). Here, the district court excluded only Caldwell's mother when she repeatedly disrupted court proceedings, and never excluded all spectators from the courtroom even when the court locked the courtroom doors. We conclude that the district court did not err.

## Hearsay Testimony

Caldwell argues that statements by his alleged accomplices—his fellow "LL's"—were inadmissible as statements against interest. But Caldwell fails to identify any out-of-court statements that would constitute hearsay if not covered by the exception for statements against interest contained in Minn. R. Evid. 804(b)(3). We conclude that Caldwell's hearsay argument lacks merit.

## Transferred Intent

■ Caldwell argues that the district court erred when it instructed the jury on transferred intent. Caldwell claims that the evidence in the record did not justify a transferred intent instruction. We have said "our rule for giving the transferred intent instruction requires that at the time of his actions the defendant intended to kill one person but instead accidentally killed another person." *State v. Hall,* 722 N.W.2d 472, 478 (Minn.2006). There was evidence in the record that Caldwell and Kirk Harrison intended to kill "Ill Will," not Cole. Therefore, we conclude that there was sufficient evidence to justify a transferred intent instruction.

## Accomplice Testimony

Caldwell argues that the district court erred when it failed to instruct the jury

that under Minn.Stat. § 634.04 (2010), a conviction cannot be based upon the uncorroborated testimony of an accomplice. But the court did give such an instruction. Specifically, the court gave the jury an instruction that almost exactly followed the language of CRIMJIG 3.18. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury Instruction Guides, Criminal,* CRIMJIG 3.18 (5th ed.2006). We have concluded that the language of CRIMJIG 3.18 is sufficient to instruct the jury on the requirements of Minn.Stat. § 634.04 and related caselaw. *See State v. Harris,* 405 N.W.2d 224, 231 (Minn.1987).

*Circumstantial Evidence*

Caldwell argues that the district court erred when it instructed the jury on circumstantial evidence without including the relevancy of the instruction. Caldwell's argument is unclear, but he appears to argue that the jury should have been instructed that "[c]ircumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except guilt." We upheld the denial of the requested instruction in *State v. Turnipseed,* 297 N.W.2d 308, 312 (Minn.1980). Moreover, there was substantial direct evidence that supported Caldwell's conviction in this case.

*Restitution*

 Caldwell argues that the district court violated his constitutional rights when it imposed restitution under Minn. Stat. § 611A.045 (2010). Specifically, Caldwell argues that the court did not determine, as required by Minn.Stat. § 611A.045, subd. 1, either the amount of economic loss sustained by the victim as a result of the offense or the income, resources, and obligations of the defendant. But it appears that these determinations need not necessarily be made at the time of sentencing. Specifically, Minn.Stat. § 611A.04, subd. 1(b), contemplates that the court may "amend or issue" a restitution order after sentencing if "(1) the offender is ... committed to the commissioner of corrections ... (2) sufficient evidence of a right to restitution has been submitted; and (3) the true extent of the victim's loss ... was not known at the time of the sentencing." Here, it appears from the record that these requirements have been satisfied; therefore, we conclude that the court did not abuse its discretion by failing to issue a detailed restitution order at the time of sentencing. If Caldwell wishes to challenge the amount of his restitution at the time that the court issues an order, he may do so then. For all the foregoing reasons, we conclude that Caldwell did not raise any meritorious issues in his pro se supplemental brief.

Affirmed.