ANDERSON, Justice
(dissenting).
I begin by noting that today we announce a very narrow rule of law involving a ward with no family or friends to speak for him. The majority concludes that a guardian in such a situation has the ability to order the termination of the ward’s life-sustaining medical care, and that this power is implicit in the guardian’s ability to give consent for necessary medical treatment and so does not require specific authorization by a district court. For the reasons stated below, I respectfully disagree. More importantly, I worry that the consequences of this rule of law are not so limited.
I.
I turn first to the statutory interpretation issues and conclude that the language of the statute does not authorize the guardian to make a decision to terminate end-of-life medical care.
A.
We look first to the plain language of the statute, because if, as the majority claims, the language of the statute is unambiguous, no further analysis is required. In re PERA Police & Fire Plan Line of Duty Disability Benefits of Brittain, 724 N.W.2d 512, 516 (Minn.2006) (“If the statute is not ambiguous, the inquiry ends there.”). The powers and duties of a guardian are governed by MinmStat. § 524.5-313 (2012). The statute provides that “[a] guardian shall be subject to the control and direction of the court at all times and in all things,” Minn.Stat. § 524.5-313(a), and that “[t]he court shall grant to a guardian only those powers necessary to provide for the demonstrated needs of the ward,” Minn.Stat. § 524.5-313(b). Minnesota Statutes § 524.5-313(c) also details some of the powers that a court can grant to a guardian, noting that the list is not exclusive. One of the enumerated powers, found in Minn.Stat. § 524.5-313(c)(4)(i), is the guardian’s ability to “give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service.” Minn.Stat. § 524.5-313(c)(4)(i). But this power is limited and certain extreme forms of medical care— *749 namely “psychosurgery, electroshock, sterilization, or experimental treatment of any kind” — cannot be authorized by the guardian “unless the procedure is first approved by order of the court.” Id.
The majority concludes that the termination of life support without a court order falls within the guardian’s ability to provide consent for necessary medical care. I do not believe that end-of-life decisions, including the termination of life support, fall within the statutory framework as neatly as the majority suggests. The statute discusses the guardian’s “power to give any necessary consent to enable the ward to receive necessary medical Or other professional care.” MinmStat. § 524.5-313(e)(4)(i) (emphasis ádjled). The most natural reading of this language envisions the guardian consenting to the provision of medical care to the ward, not terminating all care. Although I agree that the power of consent must also include the power to refuse conseiit, a decision to not pursue a particular course of action is different than terminating care that is currently in progress, espfebially when terminating care will cause the ward’s death. To state it more bluntly, the plgin language of the statute does hot authorize the guardian to take actiori that directly leads to the death of the ward.
Thus, I disagree with the majority’s conclusion that the plain language of the statute unambiguously authorizes guardians to terminate life-sustaining care. The plain language of the statute, stated ⅛ the positive and focused on enabling the Ward to receive necessary care, is not well suited to addressing the circumstances before us here — circumstances in which the medical care is necessary to sustain the ward’s life, but the guardian wishes to terminate care. The statute makes no mention of withdrawing consent or enablihg the guardian to terminate medical care that is essential to the ward’s survival. The silence of the statute as to a guardian’s role in terminating necessary medical care could be read to permit termination or withdrawal of care, but it is equally reasonable to conclude that the statute does not authorize these actions by a guardian, and so I would conclude that the statute is ambiguous. See Rohmiller v. Hart, 811 N.W.2d 585, 590 (Minn.2012) (recognizing that when silence renders the statute susceptible to more than one reasonable interpretation, the statute is ambiguous); In re Alexandria Lake Area Sanitary Disk NPDES/SDS Permit No. MN001^0738, 763 N.W.2d 303, 311 (Minn.2009) (“When a statute or regulation is silent on a precise issue, that silence may be evidence of ambiguity.”).
B.
The canons of statutory construction, which operate once we conclude a statute is ambiguous, also do not support the majority’s conclusion that guardians have the authority to terminate the life support of a ward without a court order. If a statute is ambiguous, it is necessary to determine the intent of the Legislature. Brayton v. Pawlenty, 781 N.W.2d 357, 363 (Minn. 2010). In searching for legislative intent, we apply our canons of construction and consider “a number of matters, including the legislative history, the necessity for the law, and the consequences of various interpretations.” Burkstrand v. Burkstrand, 632 N.W.2d 206, 210 (Minn.2001); see also MinmStat. § 645.16 (2012). In looking at the consequences of the competing interpretations, we presume that the Legislature did not intend an absurd result. Minn.Stat. § 645.17(1) (2012) (stating that when ascertaining the intention of the Legislature, courts may presume that “the legislature does not intend a result that is absurd, impossible of execution, or unreasonable”). We have also said that an ambiguous statute should not be read literally *750 if that interpretation would undermine the policy of the statute as a whole. See Low-ry v. City of Mankato, 231 Minn. 108, 113— 14, 42 N.W.2d 553, 557-58 (1950).
Vogel argues, and the court of appeals agreed, that because the termination of life support is not listed specifically in Minn. Stat. § 524.5 — 313(c)(4)(i) as a decision that requires court approval, a guardian does not need court authorization for this type of action. But this interpretation gives too much weight to the concept of expressio unius est exclusio alterius, which loosely translates as “the expression of one thing is the exclusion of another.” State v. Caldwell, 803 N.W.2d 373, 383 (Minn.2011). In essence, the expressio unius canon presumes that when the Legislature has enumerated a list of items, a court should assume that this list is meant to be exclusive, and therefore any item that does not appear on the list should be viewed as being intentionally omitted. Id. (“Expres-sio unius generally reflects an inference that any omissions in a statute are intentional.”). Thus, because the Legislature listed “psychosurgery, electroshock, sterilization, or experimental treatment of any kind” in Minn.Stat. § 524.5 — 313(c)(4)(i) as treatments requiring court authorization, Vogel argues that we should assume that the Legislature did not intend for there to be an authorization requirement for the termination of life support.
But this interpretation requires us to assume, despite a lack of evidence in the legislative history of this statute, that the process for a guardian to order the termination of a ward’s life support was an issue that the Legislature actually considered. In cases in which the legislative history is noticeably silent as to any discussion of the issue, it is improper to employ the expres-sio unius canon because there is no basis for believing that the missing item was considered, or even foreseen, by the Legislature. Caldwell, 803 N.W.2d at 383 (explaining that the expressio unius canon is only justified when the language of the statute supports an inference that the omission was intentional). As the United States Supreme Court has explained, “We do not read the enumeration of one case to exclude another unless it is fair to suppose that [the legislative branch] considered the unnamed possibility and meant to say no to it.” Barnhart v. Peabody Coal Co., 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003). And in this case, it is unfair to make such an assumption. The guardianship statutes and legislative history give no indication that the Legislature considered whether a guardian could terminate life support at all, much less whether it required court approval, and so it is improper to read the list of items requiring court authorization in Minn.Stat. § 524.5-313(c)(4)(i) as the Legislature’s way of saying that court authorization is not required for termination of life support.
Given the lack of evidence that the Legislature intended to speak on the necessity of court approval when a guardian seeks to terminate a ward’s life support, we look beyond the language of the specific statute to the rest of the statutory scheme and review how the termination of life support fits into the general scheme that the Legislature has created for the interactions between the courts and guardians. Erd-man v. Life Time Fitness, Inc., 788 N.W.2d 50, 56 (Minn.2010) (noting that we must “read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations”). On this point, I believe the answer is clear: the Legislature intended for guardians to seek court approval before taking extreme measures. Minnesota Statutes § 524.5-313(a) provides that “[a] guardian shall be subject to the control and direction of the court at all times and in all things.” The termination of life support is the most difficult decision that a guardian can be *751 asked to make. It involves not only the analysis of medical evidence, but also consideration of the ward’s beliefs and wishes, which in some cases, including this one, may not be clear to the guardian even though they may implicate some of the ward’s most fundamental and deeply held beliefs. In short, the decision to terminate life support is a more complicated decision with more severe and permanent consequences than any of the circumstances listed by the Legislature in Minn.Stat. § 524.5 — 313(c)(4)(i) as requiring court approval.
It is clear that the Legislature intended to ensure the well-being of wards by providing for court review and supervision of the more difficult and challenging decisions made by a guardian. When a guardian is faced with the decision to terminate life support, the potential harm that could be caused by a guardian’s abuse of discretion is far greater than the decision to consent to “experimental treatment” listed in Minn.Stat. § 524.5-313(c)(4)(i), which in some instances may not even involve particularly controversial decisions. An interpretation that a guardian’s actions require court approval for the latter but not for the former ignores the very reason for which the statute exists. But whether viewed as undermining the policy of the statutory scheme as a whole, or as an absurd result not intended by the Legislature, empowering the guardian to make these life-or-death decisions under these circumstances is not consistent with legislative intent. Therefore, the statutory language simply does not support the expansive powers for guardians that the majority grants.
I conclude that the guardian actions requiring court involvement set out in Minn. Stat. § 524.5 — 313(c)(4)(i) is not an exclusive list, and that the removal of life support given the facts presented here also requires court authorization.[1]
II.
I turn next to the specific facts of this case and the troubling implications of the majority opinion.
It is to the everlasting credit of Allina here that management recognized the uncertainty in the law and the need to seek court approval for the withdrawal of medical care. The evidence mustered to support the claim that Tschumy would have wanted life support terminated is extremely weak,[2] which shows the necessity of *752 court involvement before such action is taken. More importantly, the effect of the rule announced today is to give guardians of the most isolated and vulnerable wards unchecked power to make life-or-death decisions, while simultaneously decreasing the likelihood that any judicial review of this decision will ever occur.
We deal here not with the more typical end-of-life treatment circumstances in which competent adults have expressed their wishes, or better yet, have prepared health care directives, or in which family or even close friends may well know the wishes of the patient. Rather, for many of our fellow citizens who are cognitively impaired, it is a different story. It is not unusual for the disabled to have the assistance of court-appointed guardians. Perhaps those guardians have some training or knowledge on making end-of-life decisions, and perhaps not. Perhaps those guardians have the best interests of the ward in mind, and perhaps not. Perhaps the ward has expressed a view on medical care, and perhaps not. But once the decision is made by the guardian to withdraw medical care, for good or ill, whether for sound motives or base motives, whether that decision is well informed from a medical perspective or otherwise, it will be made in silence and with no check or review of the guardian’s judgment
The majority opinion recognizes none of these complications and simply empowers guardians to act. I acknowledge that the subset of cases subject to the rule announced today is likely small, but the consequences are great and the better course is to rely on judicial supervision and approval for the withdrawal of medical care unless and until the legislature provides a better framework for dealing with these decisions.
Therefore, because I believe that the best interpretation of Minn.Stat. § 524.5-318(c)(4)(i) requires guardians, in circumstances such as those found here, to obtain court authorization before terminating a ward’s life support, I respectfully dissent.

. This interpretation is also supported by our decision in In re Conservatorship of Torres, 357 N.W.2d 332, 339-40 (Minn. 1984) (concluding that Minnesota courts have the power to authorize a guardian to order the removal of a ward’s life support system). In Torres, we characterized the statute that preceded Minn.Stat. § 524.5-313(c)(4)(i) as "requiring] the [guardian] to have court approval before consenting to more controversial medical procedures on behalf of the [ward].” Torres, 357 N.W.2d at 337. Thus, in Torres we rightly discussed the statute not in terms of the specific examples of controversial medical procedures that are enumerated, but instead recognized that the enumerated procedures are representative of the type of decision that guardians should seek court-approval for — that is, “controversial medical procedures.” Id.

. Although various assurances were offered that Tschumy would not want continued medical care under these circumstances, these statements were all conclusory and not based on any expressed intent by Tschumy. In fact, as Vogel observed, Tschumy did not trust doctors and specifically refused to discuss the issue. The closest Vogel comes to submitting evidence of Tschumy’s actual wishes was his observation that "Mr. Tschumy wanted to be outside much of the time,” which leads Vogel to conclude that Tschumy “would not want to spend his remaining days inside, confined to a hospital bed.” To say that the fact that Tschumy enjoyed the outdoors is underwhelming evidence of Tschumy's desire to have his life support terminated is an understatement of the first order.