*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0748**

State of Minnesota,
Respondent,

vs.

Mackey Keyota Drake,
Appellant.

**Filed May 16, 2016
Affirmed
Peterson, Judge**

Rice County District Court
File No. 66-CR-14-809

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Fossum, Rice County Attorney, Terence Swihart, Assistant County Attorney, Faribault, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Peterson, Judge; and Jesson, Judge.

# U N P U B L I S H E D   O P I N I O N

**PETERSON**, Judge

In this appeal from a conviction of violating the terms of a domestic-abuse order for protection, appellant argues that he was deprived of a fair trial by (1) the district court's

evidentiary rulings, (2) the district court's refusal to grant a continuance following the state's late disclosure of evidence, (3) defense counsel's failure to effectively cross-examine the victim, and (4) the district court's misstatement of the law during jury instructions. We affirm.

## FACTS

Appellant Mackey Keyota Drake and C.L. met in June 2012 and began a romantic relationship. When the relationship ended in April 2013, C.L. obtained an order for protection (OFP) against Drake that prohibited him from having any contact with C.L. Drake was charged with violating the OFP by making phone calls to C.L. on March 14 and 15, 2014, and the case was tried to a jury.

C.L. testified at trial that she was the one who decided to end the relationship, and, over Drake's objection, she obtained the OFP because there had been violence in the relationship. C.L. testified about two phone calls that she received from Drake in March 2014. She received the first call in the evening from a number that she did not recognize. When she answered, she recognized Drake's voice. According to C.L., Drake said that he had gotten C.L.'s phone number from one of his friends, he wanted C.L. to move back to the cities, she was his property, and he would come to get her if she did not move back. Drake claimed that he and C.L. were still married, although they had never been married. C.L. received a second call from the same number at 1:00 a.m. She answered the phone and identified the caller's voice as Drake's. C.L. received other calls from unknown numbers, which she suspected was Drake using someone else's phone to call her. C.L. called the police and reported the calls from Drake.

2

Morristown Police Officer Christopher Langr responded to C.L.'s call. C.L. told Langr that she had an OFP against Drake and that he had called her cell phone. Langr took photographs of C.L.'s cell phone, and he testified at trial that the photographs, exhibits 2 and 3, showed that two calls were made from Drake's phone number to C.L.'s cell phone. Langr testified that one of the photographs, exhibit 3, showed "[t]hat the phone call was answered and that there was an on-going live connection between the two phones." Langr used his work cell phone to call Drake's number. A man with a low voice answered the call but did not say anything when Langr asked for Drake, and Langr hung up. When Langr was asked if he talked to C.L. about whether she spoke to Drake, Langr testified:

> At that point it was kind of her own investigation also, she was answering the phone calls and trying to confirm who was calling her.
>
> I myself did not witness or was able to record any of the conversations. Therefore, I did not make any documentation saying that I heard what she said or anything to that matter.

Drake denied making any calls to C.L. He testified that his phone was missing for a week in March 2014, including on March 15. Drake testified that his friend Bo, who had had an intimate relationship with C.L., had taken the phone. Drake claimed that he was the one who had broken up with C.L. and that he had not had any contact with her since that time. Drake suspected that Bo made the calls to C.L. and pretended to be Drake, and C.L.'s phone log showed a call to a Bo.

In closing argument, defense counsel emphasized that C.L. did not disclose until trial that a conversation occurred between her and Drake and argued that the reason C.L. did not disclose the conversation sooner was because it never occurred. Defense counsel's

3

argument addressed the credibility of C.L.'s testimony that she recognized Drake's voice versus Drake's testimony that he did not have his phone when the calls were made to C.L. In rebuttal, the prosecutor stated: "So this idea that [these] conversations [are] the crucial piece of this, . . . it just doesn't matter. He can't cause her phone to ring, he cannot contact her in any fashion, whether or not they had a conversation." The district court instructed the jury:

> The elements of a violation of an Order for Protection are[:] first, there was an existing court order for protection; second, that [Drake] knew of the existence of the order; third, [Drake] violated a term or condition of the order by calling [C.L.]; four, [C.L.] received a call from [Drake] on or about March 15, 2014 . . . .

The jury found Drake guilty of violating the OFP, and the district court sentenced him to an executed term of 33 months in prison. At the sentencing hearing, Drake exercised his right to make a statement, asserting that the photographs of C.L.'s phone log indicated that C.L. missed a call from Drake's phone at 1:09 a.m. when she was on a call with Bo and that C.L. made a call to Drake's phone at 3:14 a.m. The district court stated that Drake's assertion went to the sufficiency of the evidence, which was an issue that could be raised on appeal and was not relevant to sentencing.

This appeal follows.

**D E C I S I O N**

**I.**

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *State v. Amos,* 658 N.W.2d 201, 203

4

(Minn. 2003). "On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *Id.*

*Relationship evidence*

Drake argues that the district court abused its discretion in admitting evidence that C.L. obtained the OFP because there had been violence in her relationship with Drake. Defense counsel objected to the evidence, and the prosecutor argued that the evidence was admissible under Minn. Stat. § 634.20 (2014) to explain why C.L. obtained the OFP. The district court allowed the evidence and gave a limiting instruction, stating that the only purpose of the evidence was for the jury to understand why the OFP was obtained and that it was not relevant to whether Drake violated the OFP and could not be considered for that purpose.

Minn. Stat. § 634.20 states:

> Evidence of domestic conduct by the accused against the victim of domestic conduct . . . is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. "Domestic conduct" includes, but is not limited to, evidence of domestic abuse, violation of an order for protection under section 518B.01; violation of a harassment restraining order under section 609.748; or violation of section 609.749 [stalking] or 609.79, subdivision 1 [obscene or harassing phone calls].

"Domestic abuse" includes "physical harm, bodily injury, or assault"; or "the infliction of fear of imminent physical harm, bodily injury, or assault." Minn. Stat. §§ 518B.01, subd. 2(a)(1)-(2), 634.20 (2014).

5

In *State v. McCoy*, the supreme court adopted "Minn. Stat. § 634.20 as a rule of evidence for the admission of evidence of similar conduct by the accused against the alleged victim of domestic abuse." 682 N.W.2d 153, 161 (Minn. 2004). The supreme court explained that such evidence may be admitted "to put the crime charged in the context of the relationship between the two" and to "assist[] the jury by providing a context with which [to] better judge the credibility of the principals in the relationship." *Id.* at 159, 161. After *McCoy* was decided, the legislature amended Minn. Stat. § 643.20 to use the phrase "domestic conduct" instead of "similar conduct." 2013 Minn. Laws ch. 47, § 7, at 208. The supreme court has noted that the 2013 amendment "did not change the underlying definition." *State v. Fraga*, 864 N.W.2d 615, 627 n.12 (Minn. 2015).

Drake argues that "[t]he conduct alleged in this case was not 'similar' to the prior allegation, as required by section 634.20." But Minn. Stat. § 634.20 specifically includes "evidence of domestic abuse" in the definition of "domestic conduct," and the definition of "domestic conduct" is identical to the definition of "similar conduct" in the previous version of the statute. *Compare* Minn. Stat. § 634.20 (2012), *with* Minn. Stat. § 634.20 (2014).

Drake also argues that any probative value was substantially outweighed by the danger of unfair prejudice. "[U]nfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Swinger,* 800 N.W.2d 833, 839 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. Sept. 28, 2011). "Evidence that is probative, though it may arouse the passions of the jury, will still be admitted unless the tendency of the evidence to persuade by illegitimate means overwhelms its legitimate probative force." *State v. Schulz,* 691 N.W.2d 474, 478-79 (Minn. 2005). One of those

6

illegitimate means is "[e]vidence of a person's character or a trait of character" introduced "for the purpose of proving action in conformity therewith on a particular occasion." Minn. R. Evid. 404(a).

C.L. responded "[y]es" to the prosecutor's question about whether she had obtained the OFP because there had been violence in her relationship with Drake, and the issue of violence was not brought up again. Given the single, brief reference to violence and the district court's limiting instruction, there was not a risk of persuasion by illegitimate means.

*Impeachment evidence*

Minn. R. Evid. 609(a)(1), (b), allows evidence of a felony conviction to be admitted for impeachment purposes provided that ten or fewer years have elapsed since the conviction or release from confinement and the probative value of the evidence outweighs its prejudicial effect. In considering whether probative value outweighs prejudicial effect, a district court considers five factors: "(1) the impeachment value of the prior crime; (2) the date of the conviction and the defendant's subsequent history; (3) the similarity of the past crime with the charged crime; (4) the importance of defendant's testimony; and (5) the centrality of the credibility issue." *State v. Williams,* 771 N.W.2d 514, 518 (Minn. 2009) (citing *State v. Jones,* 271 N.W.2d 534, 538 (Minn. 1978)).

The state sought to admit evidence of two prior felony convictions, a 2013 conviction of violating a no-contact order and a 2011 conviction of domestic assault. The district court ruled that the state could elicit testimony that Drake had been convicted of two felonies but could not specify the offenses. Drake argues that the district court abused its discretion by admitting the evidence of his prior convictions.

7

*1. Impeachment value*

The Minnesota Supreme Court has ruled that "impeachment by prior crime aids the jury by allowing it to see the whole person" and better judge credibility because "abiding and repeated contempt for laws [that one] is legally and morally bound to obey" demonstrates a lack of trustworthiness. *State v. Brouillette,* 286 N.W.2d 702, 707 (Minn. 1979) (quotations omitted). "[T]he fact that a prior conviction did not directly involve truth or falsity does not mean it has no impeachment value." *Williams*, 771 N.W.2d at 518 (quotation omitted); *see also State v. Hill,* 801 N.W.2d 646, 651-52 (Minn. 2011) (reaffirming application of whole-person rationale and stating that "*any* felony conviction is probative of a witness's credibility"). The district court did not err in applying the whole-person rationale and finding that this factor favored admission of evidence of the prior convictions.

*2. Dates of convictions*

The district court found that this factor favored admission because both convictions, having occurred one and three years before trial, were well within the rule 609 ten-year time limit. Drake concedes that this factor favors admission.

*3. Similarity of past crimes with charged crime*

The district court found that the past crimes and the charged crime were similar because all involved domestic violence, so the court ruled that the past offenses would be unspecified.

> If a court finds that the prejudicial effect of disclosing the nature of a felony conviction outweighs its probative value, then it may still allow a party to impeach a witness with an

8

unspecified felony conviction if the use of the unspecified conviction satisfies the balancing test of Rule 609(a)(1).

*Hill*, 801 N.W.2d at 652-53.

### 4. Importance of defendant's testimony

When a defendant testifies, as Drake did in this case, this factor does not weigh against admissibility. *See State v. Abbott,* 356 N.W.2d 677, 680 (Minn. 1984) (stating that district court's decision to allow admission of evidence of prior conviction "did not have the effect of keeping defendant's version of the events from the jury" because he testified and his credibility was at issue).

### 5. Centrality of credibility

When a defendant's credibility is central to his defense, this factor weighs in favor of admitting evidence of the prior convictions. *State v. Swanson*, 707 N.W.2d 645, 655 (Minn. 2006). "[I]f the issue for the jury narrows to a choice between defendant's credibility and that of one other person then a greater case can be made for admitting the impeachment evidence, because the need for the evidence is greater." *State v. Bettin*, 295 N.W.2d 542, 546 (Minn. 1980). Because this case narrowed to a choice between Drake's and C.L.'s credibility, this factor favored admission of evidence of the prior convictions.

The district court did not abuse its discretion in balancing the *Jones* factors and allowing Drake to be impeached with the unspecified felony convictions.

### Drake's probationary status

The district court denied Drake's motion in limine to exclude evidence of his probationary status and allowed his probation officer to provide Drake's phone number and

testify that he supervised Drake. The probation officer testified that he called Drake using the number and that the caller identification on his phone showed that Drake used the phone with that number to make calls to the probation officer. Drake argues that the evidence of his probationary status was inadmissible because it was evidence of prior bad acts. He contends that the jury did not need to know that he was on probation in order for the state to prove that the phone number belonged to him. But the state did not need to prove only that the phone number belonged to Drake; the state needed to prove that Drake made calls to C.L. The probation officer's testimony was evidence that the number that appeared on C.L.'s phone was the number for a phone that Drake actually used to make and receive calls.

Drake argues that the jury could have been prevented from receiving evidence of his probationary status by having the probation officer identify himself as a county employee, rather than as a probation officer. We have found nothing in the record that indicates that this option was presented to the district court, and Drake has not explained how the district court abused its discretion by failing to independently choose this option. But, even if the district court erred in admitting the evidence, we are not persuaded that the error was prejudicial because the probation officer's identity was referred to only to explain why he knew what Drake's phone number was. The probation officer did not identify the offense for which Drake was on probation or say anything about Drake's probationary status. *See State v. Hall*, 764 N.W.2d 837, 843 (Minn. 2009) (concluding that new trial was not warranted when reference to defendant's prior conviction was of a passing nature and was not dwelled on or highlighted for the jury).

**II.**

The district court has discretion to decide whether to grant a continuance. *State v. Miller,* 488 N.W.2d 235, 239 (Minn. 1992). On review of a denial of a continuance request, an appellate court must examine "the circumstances surrounding the requested continuance and whether the denial was so prejudicial in the preparation of an adequate defense as to materially affect the outcome of the trial." *Id.* (quotation omitted). "A defendant must show prejudice to justify reversal." *State v. Rainer,* 411 N.W.2d 490, 495 (Minn. 1987).

On the second day of trial before the jury was sworn, the prosecutor met with C.L. for the first time to go over her testimony, and C.L. stated that she had had a conversation with Drake when he called. C.L. had not previously stated that a conversation occurred. Defense counsel requested a mistrial or that the evidence be excluded. The district court stated that defense counsel's request was not properly characterized as a request for a mistrial because the jury had not been sworn and addressed whether the case should be continued. The district court denied a continuance. The court offered to grant a 30-minute recess to allow defense counsel to meet with C.L., but defense counsel declined the offer because he did not want to meet with C.L. alone, which could make him a potential witness, or with a representative from the county attorney's office.

Drake asserts that the late disclosure changed his trial strategy because his theory had been that an unanswered call was not "contact" and the state could not prove that Drake made the call when it was not answered. Drake argues:

> With additional time the defense could have had an investigator speak with witnesses, further examined the phone history log, and consulted with an expert to examine the phone

11

and decode meanings of the call history symbols which appear to suggest that there was only one incoming, answered call from "Mackey;" the other call appears to be outgoing and unanswered.

The cases relied on by Drake involved scientific, technical issues. *State v. Holmes*, No. A04-1017, 2005 WL 1804256, at *2 (Minn. App. Aug. 2, 2005) (after voir dire began in criminal-sexual-conduct case, state disclosed that examining nurse had specialized training in examining sexual-assault victims and would testify that photographs showed tears, rather than abrasions, and that she had never seen this type of injury in a consensual-sex investigation), *review denied* (Minn. Oct. 26, 2005); *State v. Scharfencamp*, 416 N.W.2d 825, 826 (Minn. App. 1987) (in driving-while-impaired case, defense prepared for trial believing nurse would testify that she used a brown-stoppered vial to store the defendant's blood rather than a gray-stoppered vial that contained the proper chemicals for blood-alcohol testing, but learned on the day of trial that nurse would testify that she used a gray-stoppered vial).

Unlike *Scharfencamp* and *Holmes*, Drake has not shown that a need for an expert to examine the phone arose only when C.L. stated that she spoke with Drake when he called. If the call-history symbols appeared to suggest that there was one incoming, answered call from Mackey, which is Drake's first name, the meanings of the symbols were essential to Drake's theory that there was no contact because there was no answered call. If an expert was needed to examine the call-history log and decode the call-history symbols, the expert was needed before C.L. stated that she spoke with Drake.

Drake responded to C.L.'s testimony that she spoke with him by attacking her credibility. This was a straightforward case with only four witnesses, and Drake does not identify any additional information that he could have learned to rebut C.L.'s testimony that she spoke to Drake by having an investigator interview witnesses. Also, as the district court noted, C.L. was a known witness who could have been interviewed by an investigator for defense counsel before trial. Because Drake has not shown that the denial of the continuance caused him prejudice, he is not entitled to a new trial on that basis.

**III.**

To prevail on a claim of ineffective assistance of counsel, a defendant must show "(1) that his counsel's representation 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nissalke v. State,* 861 N.W.2d 88, 94 (Minn. 2015) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984)). "The objective standard of reasonableness is defined as representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Vang,* 847 N.W.2d 248, 266-67 (Minn. 2014) (quotations omitted) (noting that "counsel's performance is presumed to be reasonable"). An appellate court generally will not review counsel's trial strategy. *Opsahl v. State*, 677 N.W.2d 414, 421 (Minn. 2004).

Drake argues that his trial counsel provided ineffective assistance by failing to cross-examine C.L. about her phone's call-log history. Drake asserts that exhibit 3 shows a 1:09 a.m. outgoing call from C.L.'s phone to Drake's phone, indicating that her testimony

13

that she answered a call from Drake at 1:00 a.m. was not credible. But defense counsel might have made a strategic decision to attack C.L.'s credibility by focusing on her failure to disclose until trial that she had a conversation with Drake rather than highlighting the call-log history. As Drake notes, the call-log history also apparently indicates an incoming, answered call, and multiple calls were not required to support Drake's conviction. Because Drake has not shown that defense counsel's cross-examination of C.L. fell below an objective standard of reasonableness, rather than being a matter of trial strategy, we cannot conclude that Drake received ineffective assistance.

**IV.**

Because Drake did not object to the jury instructions, the plain-error standard of review applies. *See State v. Peltier*, 874 N.W.2d 792, 799 (Minn. 2016).

> Under plain-error analysis, [the defendant] must show that: (1) there was error; (2) that was plain; and (3) his substantial rights were affected. . . . If these three prongs are met, the reviewing court then assesses whether it should address the error to ensure the fairness and integrity of the judicial proceedings.

*State v. Brown,* 815 N.W.2d 609, 620 (Minn. 2012) (quotation and citations omitted).

"Jury instructions, reviewed in their entirety, must fairly and adequately explain the law of the case." *State v. Koppi*, 798 N.W.2d 358, 362 (Minn. 2011). "An instruction is in error if it materially misstates the law." *State v. Kuhnau,* 622 N.W.2d 552, 556 (Minn. 2001).

During rebuttal, the prosecutor argued that a call did not have to be answered for a violation of the OFP to occur. The district court instructed the jury:

14

The elements of a violation of an Order for Protection are[:] first, there was an existing court order for protection; second, that [Drake] knew of the existence of the order; third, [Drake] violated a term or condition of the order by calling [C.L.]; four, [C.L.] received a call from [Drake] on or about March 15, 2014 . . . .

Drake argues that the district court's failure to instruct the jury that a call must be answered for a violation of the OFP to occur constituted plain error, particularly in light of the prosecutor's rebuttal argument. "An error is plain if it was clear or obvious," and "[u]sually this is shown if the error contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006) (quotation omitted). The OFP prohibits "any contact with [C.L.] whether in person, by telephone, mail or electronic mail or messaging, through a third party, or by any other means." Drake cites *State v. Phipps*, to support the position that an unanswered call does not constitute contact. 820 N.W.2d 282, 286 (Minn. App. 2012). *Phipps* is not on point because it involved personal contact, and there are no Minnesota appellate court cases addressing whether an unanswered phone call may constitute contact. Accordingly, any error in not instructing the jury that a call must be answered for a violation of the OFP to occur was not plain.

Drake has also failed to show that any error affected his substantial rights. "An error affects a defendant's substantial rights if the error was prejudicial and affected the outcome of the case." *State v. Wenthe*, 865 N.W.2d 293, 299 (Minn. 2015) (quotations omitted), *cert. denied*, 136 S. Ct. 595 (2015). "[T]here must be a reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). This case turned on the jury's assessment of C.L.'s and

15

Drake's credibility. Drake claimed that he did not have his phone when the calls were made to C.L. If the jury credited Drake's testimony, whether a call was answered would have been irrelevant because Drake could not have made the call. C.L. testified that she did not recognize Drake's number when she received the first call from him and only knew that it was Drake calling because she answered her phone and recognized his voice. Given these two versions of events, there is not a reasonable likelihood that instructing the jury that a call must be answered would have significantly affected the verdict.

**Affirmed.**